PLANNED PARENTHOOD ASSOCIA-
TION OF UTAH, et al., Appellants,

v.

Richard S. SCHWEIKER, Secretary, U.S.
Department of Health and
Human Services.

No. 82–2334.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 24, 1983.

Decided Feb. 18, 1983.

James L. Feldesman, with whom Jacqueline C. Leifer, Washington, D.C., was on brief, for appellants.

Alfred R. Mollin, Atty., Dept. of Justice, Washington, D.C., for appellee; Stanley S. Harris, U.S. Atty., Leonard Schaitman and Eloise E. Davies, Attys., Dept. of Justice, Washington, D.C., were on brief for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In past years the Utah Department of Health and two private nonprofit organizations, Planned Parenthood Association of Utah and Park City Community Clinic, have all received annual funds under title X of the Public Health Service Act to provide comprehensive family planning services, excluding abortions, to Utah citizens. *See* 42 U.S.C.A. §§ 300 to 300a–6a (1982). In its most recent title X award, however, the Department of Health and Human Services (HHS) granted all funds bound for Utah to the state health department. Planned Parenthood and Park City challenged the award in the District Court, chiefly on the grounds that the award violated title X and applicable regulations because (1) the state health department seems forbidden by a recent state enactment from providing services to unmarried minors whose parents do not first consent in writing, and (2) either HHS did not pay sufficient heed to the private organizations' statutory right to apply directly for a grant, or Utah did not give them an adequate opportunity to par-

ticipate in the development of its consolidated grant application.

The District Court denied the plaintiffs' claim for a preliminary injunction and granted HHS's motion for summary judgment. In doing so it avoided ruling on the effect that the Utah consent law had on the propriety of HHS's decision to grant all title X funds to the state health department. Although we find that the District Court erred in failing to consider the plaintiffs' consent contentions, we nonetheless affirm the District Court's disposition. We find that Utah has provided adequate assurances that it will give unmarried minors who lack parental consent access to title X services, and that the procedures through which HHS consolidated this grant at the state level were adequate under the statute and regulations.

I

Title X authorizes the Secretary of HHS "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* § 300(a).[1] Before July 1977

Planned Parenthood received funds under this program directly from HHS. With the grant awarded in July 1977, for reasons not entirely clear, Planned Parenthood began to receive title X funds as a "delegate" agency of the state of Utah. This new arrangement had no apparent consequences on Planned Parenthood's programs or level of funding; it simply meant that Planned Parenthood's funds passed first through the state of Utah's hands.

In July 1980 Planned Parenthood once again began to receive funds directly from HHS. This switch was prompted by a statement of intent passed by the Utah legislature which declared that, in administering title X funds, the state could contract only with other public entities and thus that private organizations like Planned Parenthood could no longer serve as delegates of the state. Appellant's Addendum at 73 (affidavit of Planned Parenthood's executive director). Thus, to continue Planned Parenthood's funding, HHS returned in its July 1980 award to its prior practice of funding the private organization directly.[2]

Before HHS awarded its July 1981 grant, the Utah state legislature passed Senate Bill 3.[3] Although the reach of S.B. 3 is now

---

1. Projects are to include "services for adolescents," and grantees are to "encourage family participation" in projects that receive assistance "[t]o the extent practical." 42 U.S.C.A. § 300(a) (1982). With regard to the award decision and the application process, the statute provides:

> In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance. Local and regional entities shall be assured the right to apply for direct grants and contracts under this section, and the Secretary shall by regulation fully provide for and protect such right.

*Id.* § 300(b).

2. The statement of intent also declared that all title X funds bound for the state should go to the state health department. Appellant's Addendum at 72 (affidavit of Planned Parenthood's executive director). Obviously, this could not force HHS to *grant* all funds for Utah

services to the state health department, though it did cause the state health department to *apply* for all of those funds. (An HHS official has confirmed that the state health department applied for all the funds to be distributed in July 1981 and July 1982. *See* Martin Deposition at 158. According to Planned Parenthood, the state health department also did so in its application for July 1980 funds, its first chance after the Utah legislature passed its statement of intent. Appellant's Brief at 12.)

3. The bill reads as follows:

> Section 1. As used in this act:
> (1) "Contraceptive services" means any material, program, plan, or undertaking which provides instruction on the use of birth control devices and substances, encourages individuals to use birth control methods, or provides birth control devices.
> (2) "Abortion services" means any material, program, plan, or undertaking which seeks to promote abortion, encourages individuals to obtain an abortion, or provides abortions.

somewhat in doubt, the bill seemed at the time to prohibit state agencies from providing even title X contraceptive services to unmarried minors who lacked parental consent. HHS officials in the regional office responsible for Utah were concerned that a consent requirement for minors might violate department regulations, which require title X projects to provide services "without regard to . . . age," 42 C.F.R. § 59.5(a)(4) (1982). *See* Appellant's Addendum at 67 (memorandum to regional health administrator). The problem, however, was not new. In the previous grant year, before S.B. 3 was passed, the Utah state health department was already refusing to serve unmarried minors whose parents had not consented. HHS's regional health administrator believed that this informal policy did not necessarily violate the regulations, because the state health department referred these minors to Planned Parenthood or Park City, "which, in effect, satisfied the requirements of title X since they were seeing that these individuals received their services." *Id.* at 68 (letter from regional health administrator to deputy director of Office of Intergovernmental Affairs). The regional health administrator, however, was apparently unsure whether S.B. 3 would affect this prior practice, and he asked for advice from an HHS regional attorney. *See id.* at 70 (letter from regional health administrator to assistant secretary for health). Yet before the legal questions were fully answered, the date for awarding the grant slipped by, and after a brief delay HHS awarded its July 1981 funds as it had

the year before: some directly to Planned Parenthood and Park City, some to the state health department. Presumably, the regional health administrator thought that if the state continued to refer minors to the other title X grantees, the grant would conform with the regulations. And the grant decision was not irreversible: "if these organizations don't fulfill the requirements of title X," he reasoned, "we can take the money back." *Id.* at 69 (regional health administrator to deputy director of Office of Intergovernmental Affairs).

It is the next year's grant, originally scheduled to be awarded in July 1982, that is the subject of this appeal. In March 1982 each of the three Utah grantees submitted applications for renewal of their grants, the state health department requesting all the title X money slated to finance projects within the state. Based on its application as it then stood, however, the state health department would never have received all the funds bound for the state. Dr. Edward D. Martin, then director of HHS's Bureau of Community Health Services,[4] found the application incomplete in two respects. Martin Deposition at 57–59. First, it made assurances for serving only approximately 4,000 of the 12,000 eligible patients in the state. Second, it did not reflect consultation with the other grantees, Planned Parenthood and Park City. HHS regulations require that applications to consolidate services in a single grantee document that "local or regional entities" that have previously provided family planning services, or that propose to do so, have been given, "to

Section 2. No public funds shall be used to provide contraceptive or abortion services to an unmarried minor without the prior written consent of the minor's parent or guardian.

Section 3. No public agency shall approve any application for public funds to support, directly or indirectly, any organization or health care provider that provides contraceptive or abortion services to an unmarried minor without the prior written consent of the minor's parent or guardian. No institution shall be denied state or federal funds under relevant provisions of law on the ground that a person on its staff provides contraceptive or abortion services in that

person's private practice outside of such institution.

Section 4. Any agent of a state agency acting alone or in concert with others who violates section 2 or 3 is guilty of a class B misdemeanor.

Appellant's Addendum at 71–72.

4. Dr. Martin controlled the allocation of title X funds to the various regions. Martin Deposition at 16. Although he did not become involved as a matter of course with garden variety applications, *id.* at 25–26, he did make the central decision involving the grant of funds in 1982 to the Utah Department of Health, *id.* at 36.

the maximum feasible extent, an opportunity to participate in the development of the [consolidated] application." 42 C.F.R. § 59.5(a)(10)(i) (1982).[5]

Although these deficiencies and other factors suggest that in March Utah really expected only to receive a portion of available funds, as it had in the past,[6] Dr. Martin soon made clear to all parties that HHS was viewing Utah's request for all funding with great interest and that a complete consolidated grant application would be given serious consideration. For several years HHS had favored consolidating grants in the interests of efficiency, when it was feasible to do so, and this policy became all the more attractive when available funds began to shrink. Martin Deposition at 132, 141, 159–61. By February 1982 HHS had already awarded consolidated grants in twenty-eight states; twenty-three were consolidated in state agencies, five in nonstate agencies. R. 38 (defendant's attachment K). To keep the hopes of a consolidated grant alive, though the July 1 date scheduled for the award of the new grant was drawing near, the regional health administrator on June 11, 1982, sent a letter to Planned Parenthood informing it of Utah's intention to apply for a consolidated grant and extending previous funding for all grantees for sixty days to enable Planned Parenthood and Park City to participate in the development of Utah's consolidated application. Appellant's Addendum at 56. The regional health administrator assured Planned Parenthood, however, that HHS would still consider its pending application on its own merits. Id.

Planned Parenthood responded on June 24, 1982, by expressing its opposition to the consolidation of grants within Utah, an approach it thought should not even be "seriously consider[ed]." Id. at 58. Although it expressed its willingness to cooperate in "legitimate" approaches for enhancing the provision of services, Planned Parenthood did not believe that HHS's proposed approach would be such an improvement. Id. Nonetheless, Planned Parenthood and Park City attended a meeting with state and local officials and representatives of HHS on July 6, 1982, to discuss consolidation. HHS representatives explained at that meeting that, while none of the current grantees was required to resubmit its application, there was still time (1) for the grantees to submit one consolidated grant application for the three of them, or (2) for each grantee to submit competing applications to consolidate a grant in its own organization. (The latter was what Utah had already done, though its application was as yet incomplete.)

The participants, however, soon came to discouraging conclusions about the feasibility of developing a joint application in which all could play an acceptable role in the

---

**5.** In fuller part the regulation reads as follows:

(a) Each project supported under this part must:

. . .

(10)(i) Provide that if an application relates to consolidation of service areas or health resources or would otherwise affect the operations of local or regional entities, the applicant must document that these entities have been given, to the maximum feasible extent, an opportunity to participate in the development of the application. Local and regional entities include existing or potential subgrantees which have previously provided or propose to provide family planning services to the area proposed to be served by the applicant.

(ii) Provide an opportunity for maximum participation by existing or potential subgrantees in the ongoing policy decisionmaking of the project.

42 C.F.R. § 59.5(a)(10) (1982).

**6.** According to its March application, the state health department was applying for the full share of Utah's title X funds "to comply with the intent" of the state legislature's directive that it "apply for all Title X funds available to the State of Utah." Record ("R.") 38 (attachment H to defendant's memorandum); see supra note 2. In Planned Parenthood's view, this suggests that the deficiencies in Utah's application reflected half-heartedness rather than ignorance of what a complete consolidated grant application should contain. It should be noted, however, that Dr. Martin was apparently not aware at this time that the state health department had applied in prior years for all funds bound for the state. See Martin Deposition at 158. As noted, Dr. Martin did not normally get involved in reviewing individual applications. See supra note 4.

provision of services. The problem with a grant consolidated in the state health department was twofold. First, the state was prohibited by the Utah legislature's statement of intent from directly contracting with Planned Parenthood or Park City. Appellant's Addendum at 61 (HHS's minutes of meeting). Although the state health department could still legally contract with local public health departments, which could in turn contract with the private organizations, local officials at the meeting thought it would be "political suicide" for them to do so.[7] *Id.* Second, a representative of the state attorney general said that, while the attorney general had not taken the position that the private organizations would be subject to the requirements of S.B. 3 if they received funds directly from HHS (as they did at the time), they would be subject to those requirements if they somehow received funds as "delegate" agencies of the state. *Id.* at 60. The prospects were no brighter, however, for a grant consolidated under Planned Parenthood, Park City, or some consortium of the three grantees. Because the Utah legislature's statement of intent required the state health department to compete for all funds bound for Utah, *see supra* note 2, the state could not participate in an application in which the private organizations received a portion of funds directly from HHS. Appellant's Addendum at 62. For all of these reasons, the three grantees agreed at that time not to submit new grant applications; instead, they "endorsed the desirability of the current funding method and the working arrangements existing among them." *Id.*

If Planned Parenthood had hope at the end of this meeting that the participants' preference to retain the three-grantee approach, and Utah's failure up to that time to make assurances that it would serve all 12,000 eligible service recipients, would dissuade HHS from further considering granting Utah all the funds it asked for, those hopes were dashed in a July 15 letter from the regional health administrator to Planned Parenthood. The letter indicated that HHS had still not made a "final decision ... on the issue of consolidation" and reminded Planned Parenthood that it was still looking for "a service delivery model which most effectively and appropriately provides for the needs of the consumers of family planning services in Utah." R. 1 (plaintiff's attachment 8). The regional health administrator referred to the July 6 meeting as "constructive" and said he appreciated "having had [Planned Parenthood's] participation in the July 6 meeting prior to our making any final decisions on consolidation of the Family Planning grants in Utah." *Id.*

On August 30, 1982, Dr. James O. Mason, executive director of the Utah Department of Health, wrote to HHS: "The intent of this letter is to provide assurance that the Utah Department of Health can and will provide family planning services to the approximately 12,000 women currently served by the three Title X grantees in Utah." R. 10 (defendant's attachment A). He said a detailed plan was forthcoming. On the basis of this assurance,[8] Dr. Martin decided the next day to award Utah all of the title X funds it requested in its March application. Dr. Martin's "past management experiences" with the state convinced him that he could take Dr. Mason at his word. Martin Deposition at 201. Moreover, his high regard for the state health department, supported in part by the fact that Utah was one of the few states to entrust its Medicaid program to the state health department rather than to a social welfare agency, led

---

**7.** Since HHS's recent award of funds to Utah, at least one local health department has contracted with Park City to enable the latter to provide title X family planning services, though on the condition that it abide by S.B. 3. *See infra* note 30. It thus may have been that contracting with the private organizations was considered political suicide only if the private organizations did not impose consent requirements.

**8.** Dr. Martin confirmed that without this assurance HHS would have divided its funds among the three previous grantees, Martin Deposition at 154–55, as the regional office recommended before HHS received the assurance, *id.* at 99–100.

him to conclude that this was one of the instances in which consolidation was appropriate and desirable. *Id.* at 199–201, 216. On August 31, 1982, the regional health administrator notified Planned Parenthood of HHS's decision.[9]

## II

Planned Parenthood brought suit against HHS in the District Court on September 14, 1982. First, it moved for a temporary restraining order to enjoin HHS from awarding the grant to the state health department and order it to continue funding all current projects at levels proportional to the previous year's funding until the court could rule on Planned Parenthood's motion for a preliminary injunction. R. 2. Second was the motion for a preliminary injunction: to enjoin HHS from awarding a title X grant to Utah and order it instead to provide the balance of "unobligated" funds to Planned Parenthood and Park City in proportion to the amounts HHS's regional office had scheduled them to receive before HHS decided to grant funds entirely to the state health department.[10] R. 3. Finally, Planned Parenthood filed on the same day its complaint for permanent declaratory and injunctive relief.[11] R. 1. The central relief it sought was essentially the same as

that requested in the preliminary injunction: a declaration that HHS's decision to award all of the 1983-program-year funds to Utah was illegal, and an injunction that Planned Parenthood and Park City be awarded the balance of the "unobligated" funds for the 1983 program year in proportion to what the regional office was originally prepared to give them. The complaint also sought relief that was keyed to specific substantive challenges to the award and that more or less overlapped this central claim. The relief sought that was expressly related to Utah's consent requirement was capable of extending beyond this one program year: a declaration and injunction forbidding HHS from awarding any title X funds to the state health department until it agreed to serve unmarried minors who lacked parental consent. The relief it sought that was expressly unrelated to the consent requirement was for a declaration and injunction that Utah could not receive funds for the 1983 program year alone, because its application was defective under the statute and regulations.

With regard to the consent requirement, Planned Parenthood argued that the grant award to Utah violated (1) title X itself, whose legislative history was said to evince

**9.** The 60-day extension of funding that began on July 1 ran out the next day, on September 1. Nonetheless, Dr. Martin granted Planned Parenthood and Park City 30 more days of funding to "provide an orderly phase out." R. 1 (plaintiff's attachment 9).

**10.** Although Park City was not yet a plaintiff, Planned Parenthood included Park City in its request for relief so as not "to prejudice" its "right to continue receiving Title X funds." R. 3.

**11.** As initially filed, the claim for relief read in full as follows:

WHEREFORE, plaintiff prays that this Court enter an order:

(1) Declaring illegal defendant's determination to award all of the Title X 1983 program year funds allocated to Utah to the State Health Department;

(2) Declaring the State of Utah ineligible to receive any award of Title X funds because of its refusal to provide services to unemancipated minors without requiring prior parental consent;

(3) Declaring the State of Utah ineligible to receive program year 1983 Title X funds because its application is fatally defective in failing to meet statutory and regulatory requirements in addition to those relating to parental consent;

(4) Enjoining defendant from making further Title X awards to the State of Utah until Utah agrees to serve unemancipated minors without parental consent;

(5) Enjoining defendant from making any award of program year 1983 Title X funds to the State;

(6) Ordering defendant to provide the unobligated balance of program year 1983 Title X funds to plaintiff and Park City in amounts proportional to the share of Title X funding defendant's Region VIII was prepared to award to those two grantees;

(7) Awarding plaintiff its costs and disbursements in this action, including reasonable attorneys' fees; and

(8) Awarding plaintiff such other and further relief as this Court may deem just and proper.

an intent to make family planning services readily available to adolescents; and (2) HHS's regulations requiring that services be provided without regard to age, 42 C.F.R. § 59.5(a)(4) (1982), and that patient confidences be protected, *id.* § 59.11. Grounds for setting aside the award that were unrelated to Utah's consent requirement were: (1) that the consolidated award violated Planned Parenthood's statutory right to apply directly for grants, 42 U.S.C. § 300(b) (1976), and its right under department regulations to participate in the development of consolidated grant applications, 42 C.F.R. § 59.5(a)(10)(i) (1982); (2) that HHS had adhered to a "policy" favoring consolidation that had not been promulgated as a rule and thus violated the requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1976), and title X itself, 42 U.S.C. § 300a–4(a) (1976); and (3) that HHS was improperly influenced by political pressure and failed to take account of Planned Parenthood's record of past performance, which was allegedly superior to that of the Utah state health department.

The District Court granted the temporary restraining order on the same day it was requested. R. 6.[12] On September 17, 1982, HHS moved to dismiss the complaint for Planned Parenthood's failure to join an indispensable party under Fed.R.Civ.P. 19, or in the alternative to transfer the case to the federal district court in Utah. R. 10. The essence of its claim was that Planned Parenthood's requested relief would significantly harm Utah's interests and that Utah could not be made a party in Washington. On October 4 Planned Parenthood opposed the motion, R. 19; it also moved for leave to amend its complaint, R. 21, and filed an amended motion for a preliminary injunction, R. 20. The amendments were designed to "minimize any effect on the State of Utah," and thus to reduce any perceived need to dismiss the complaint on rule 19 grounds. R. 19.

As amended, the request for a preliminary injunction and for permanent relief sought the same thing: (1) to invalidate HHS's decision to award all of the 1983-program-year funds to the state health department, and (2) to order it instead to continue title X funding for all three projects at levels proportional to the previous year's funding until HHS could make a grant decision that complied with title X and applicable regulations. The amended relief differed from the relief originally sought in two important respects: (1) Utah would not be immediately deprived of all funding; pending a new decision by HHS, it would continue to receive funds in proportion to its grant from the previous year;[13] and (2) Utah could try to cure any deficiencies in its application in time to compete once more for 1983-program-year funds;[14] the original relief sought to declare Utah ineligible to receive any funds for the rest of the program year.

On October 7 the District Court granted Planned Parenthood's motion for leave to amend its complaint, R. 37, and denied HHS's motion to dismiss or change venue,

---

**12.** Also on September 14, Planned Parenthood filed a motion for an order directing HHS to make available for deposition all officials in region VIII or Washington who evaluated the applications or participated in the funding decision. R. 5. On September 17 Planned Parenthood narrowed its request, seeking to depose Dr. Connor, the regional health administrator, and Mr. McCarthy, the project officer in region VIII who recommended continuation of the three-grantee approach before Utah gave assurances it would serve the full patient population. R. 8. Moreover, although it expressed a desire to depose in addition Dr. Brandt, assistant secretary for health, and Ms. Mecklenburg, deputy assistant secretary for population affairs, it provisionally agreed instead to depose

only Dr. Martin if indeed he proved to be the HHS official who made the final award determination. *Id.* The same day, HHS sought a protective order against any depositions. R. 9. Three days later the District Court ordered the depositions of Dr. Connor and Dr. Martin. R. 12.

**13.** In this respect the amended relief resembled the temporary restraining order that was already in effect.

**14.** That is, in Planned Parenthood's view, it could declare it would not enforce its consent requirement and could afford the other grantees an additional opportunity to participate in the development of the application.

R. 26. On the same day, Park City moved to intervene as a plaintiff. R. 24. The District Court granted the motion on October 19. R. 34. On October 5 HHS moved to dismiss, or in the alternative, for summary judgment. R. 38. After an oral hearing and further written argument, on October 29 the District Court filed a memorandum order granting HHS's motion for summary judgment and an order, accompanied by findings of fact and conclusions of law, denying Planned Parenthood's motion for a preliminary injunction. R. 40–42; Appellant's Addendum at 37–55.

The District Court reasoned first that Planned Parenthood's amendment of its complaint had removed the consent issue from the litigation:

> 42. In amending its complaint and motion for a preliminary injunction, [Planned Parenthood] withdrew its prior claim that *any* HHS award of Title X funds to Utah would be inconsistent with Title X and HHS regulations regarding age discrimination and confidentiality. Since plaintiffs now concede Utah's eligibility to receive Title X funds, it is unnecessary for this Court to determine whether Utah may apply its state statute requiring parental consent to services provided by Title X funds, and whether that statute conflicts with the provisions of Title X.

Conclusions of Law ("Conclusions") at 14 (emphasis added).

On the merits of Planned Parenthood's consolidation claims, the District Court first held that the award did not violate title X itself: "not only did Congress not enact legislation prohibiting consolidated grants, but the pertinent legislative history evidences Congress' approval of consolidated grants where appropriate." *Id.* ¶ 30. Moreover, the court said, Congress in 1981 enacted a law directing HHS to give priority "to applicants using single or coordinated grant applications for multiple programs" relating to family planning for adolescents, 42 U.S.C.A. § 300z–6(a)(4) (1982). Second, the court found that Planned Parenthood had been given ample opportunity to participate in the development of the grant application at the meeting attended by the private organizations, HHS, and Utah state and local officials, but that Planned Parenthood consistently opposed consolidation and expressed no interest in participating.[15] Conclusions ¶ 34. Third, the court held that HHS satisfied the rulemaking requirements of the APA with respect to its policy of consolidation when it promulgated, after providing two solicitations for public comment, the regulation guaranteeing participation in the development of consolidated grant applications. *Id.* ¶ 31. Finally, the court held the merits of the award decision to be unreviewable on the ground that this was a matter committed to agency discretion by law within the meaning of the APA, 5 U.S.C. § 701(a)(2) (1976), in view of the broad authority conferred upon the Secretary by title X and its implementing regulations. Conclusions ¶¶ 37–41. Were the decision reviewable, however, the court held that the award decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1976), being consistent with "HHS' valid policy of grant consolidation on a case-by-case basis" to "lower administrative costs and assure better delivery of services." Conclusions ¶ 44.[16]

---

**15.** The court held in the alternative that Planned Parenthood was barred from raising the issue at this stage because it had failed to appeal on this basis to the agency. Conclusions ¶ 33.

**16.** The court's findings, though used to support its grant of summary judgment as well, were initially framed to show why Planned Parenthood was unlikely to prevail on the merits and why the preliminary injunction was therefore inappropriate. The court also held that (1) the 27% reduction in Planned Parenthood's budget that would result from the discontinuance of its prior title X funding was "strictly economic" and therefore not irreparable, Conclusions ¶ 28; (2) the discontinuance of funds did not injure Planned Parenthood's reputation, because it reflected no more than a decision based on reasons of policy, *id.* ¶ 29; and (3) because a grant of a preliminary injunction would "improperly undermine agency discretion," a weighing of relevant interests counseled against issuance of such an injunction, *id.* ¶¶ 45–46.

Planned Parenthood and Park City filed a notice of appeal on November 3, 1982, and the next day moved in this court for expedited briefing and oral argument. A three-judge panel granted the motion on November 17, 1982, and we heard oral argument January 24, 1983.

## III

The appellants' first objection to the District Court's ruling is that Planned Parenthood [17] never intended to abandon its claim that Utah's parental consent requirement made the state health department ineligible to receive all of the title X funds for services within the state. We agree that the District Court erred in holding that Planned Parenthood had abandoned this claim. Because we affirm on other grounds the District Court's award of summary judgment on the consent claims, however, we need explain only briefly why we believe the District Court was obliged to consider them.

We note first that nothing in the restructured relief itself necessarily required Planned Parenthood to narrow its objections to Utah's consent requirement. HHS had argued in support of its motion to dismiss on rule 19 grounds that Utah's absence from the suit left the court uncertain whether Utah really intended to apply its consent requirement to title X services. By amending its relief, Planned Parenthood gave Utah the chance to resubmit its application and make clear whether it intended to withhold services from minors who lacked parental consent. Although the amended complaint no longer sought the bald declaration and injunction that Utah could not receive any funds as long as it enforced a consent requirement, it did seek an order that HHS evaluate the new applications in accordance with the dictates of title X and the regulations. Thus Planned Parenthood could still argue that, once Utah had clarified its application, HHS could not award any funds to Utah if the latter intended to enforce a consent requirement.[18]

Though not required to do so by the relief it sought, Planned Parenthood did go one step further. It informed the District Court that it would not challenge Utah's ability to receive title X funds while enforcing a consent requirement, as long as some title X money went to a provider like Planned Parenthood that would not be subject to the consent requirement and that could receive referrals from the state of adolescents who lacked parental consent.[19] This change in attack responded to the government's primary rule 19 contention: that Utah was an indispensable party because revocation of its grant would adversely affect its interests. To "minimize" adverse effects on Utah, Planned Parenthood abandoned its claim that Utah could not receive *any* money if it enforced its consent requirement. R. 19. But nothing in the record indicates that Planned Parenthood intended to remove its attack based on

---

**17.** Because many of the proceedings before the District Court preceded Park City's intervention, and because much of the factual record developed below centers on Planned Parenthood, for convenience we will occasionally refer to the parties as though the appeal were brought and argued by Planned Parenthood alone, though in fact Park City is also an appellant. We discuss those few contentions appellants say are uniquely applicable to Park City *infra* note 36.

**18.** The fact that the relief sought permitted the state to receive some funds while HHS had a chance to review the resubmitted applications does not necessarily argue to the contrary. This formulation of interim relief could have merely taken at face value HHS's claim that it was doubtful Utah intended to enforce its con-

sent requirement and thus did not necessarily concede that the state could legally receive funds once HHS knew unequivocally that Utah would enforce its consent requirement.

**19.** Planned Parenthood submitted the following proposed conclusion of law:

Under its amended prayer for relief, plaintiff does not seek a declaration that the State is wholly ineligible to receive *any* Title X funds. Therefore, the Court assumes, for purposes of deciding this issue, that the old arrangement of referral of unemancipated minors who lack parental consent to PPAU and Park City for Title X services satisfies statutory and regulatory requirements.

R. 31 at 15 n. 2 (emphasis in original); *see also* Transcript of Oct. 8, 1982, Hearing at 48–49.

Utah's inability to serve minors, either directly or by referral to other title X providers, when it received *all* the funds.

The government nonetheless argued at the preliminary injunction hearing that it was "not sure" whether Planned Parenthood was still pressing its consent claims, even though Planned Parenthood's very first argument in its immediately preceding presentation concerned the consent requirement. Transcript of Oct. 8, 1982, Hearing at 23. The government asserted that the "logical conclusion" of Planned Parenthood's willingness to let Utah receive some funding was that the "alleged inconsistency between title X and the Utah statute is no longer relevant [, b]ecause if plaintiffs really say that that statute is inconsistent, then Utah arguably under their theory shouldn't get any money, which was their original complaint." *Id.* at 25–26. It is indeed possible to argue that the regulation against age discrimination would operate to bar a project engaging in forbidden discrimination from receiving any title X funds at all.[20] But the government could hardly claim that this was the only possible reading; it was the department's own regional health administrator who thought that Utah's referral of teenagers to Planned Parenthood and Park City would "in effect" satisfy the regulation's requirement. *See supra* p. 713. And even if the government by this time believed that the age discrimination regulation was an all-or-nothing requirement, it was beyond any doubt that Planned Parenthood was taking a less rigid position: it repeatedly mentioned the referral arrangement as a way that Utah might enforce its own consent

requirement while still receiving a share of federal funds.[21]

The certainty with which we declare that Planned Parenthood did not abandon its consent claims, however, should not obscure the fact that it is understandable how confusion might have arisen. The original complaint referred to the consent requirement as rendering Utah ineligible to receive any funds. Once the District Court associated the consent claim with this relief, it is not hard to see how it might have thought Planned Parenthood abandoned its consent claims when it agreed not to argue that Utah was entirely ineligible to receive funds. When Planned Parenthood maintained that Utah nonetheless could not receive *all* the funds, the court thought this objection derived only from the failings in the procedures used to consolidate the grant in the hands of a single entity. We cannot saddle Planned Parenthood with the effects of this misunderstanding, however, given that nothing in the record evinces its intent to abandon the narrower consent claim we have described, that nothing in the logic of its amended complaint requires it to do so, that the record abounds with efforts by Planned Parenthood to make consent-related arguments even after it amended its complaint,[22] and that pleadings are to be construed so as to do "substantial justice," Fed.R.Civ.P. 8(f).

### IV

Nonetheless, we find ample reason to affirm on other grounds the District Court's grant of summary judgment with respect to the consent claims.[23] We agree

20. The regulation reads: "*Each* project supported under this part must ... [p]rovide services without regard to ... age." 42 C.F.R. § 59.5(a)(4) (1982) (emphasis added). In saying it is possible so to argue, of course, we do not endorse that interpretation of the regulation.

21. Planned Parenthood quoted and underscored in both its original and amended complaints the regional health administrator's view that referral might enable Utah to receive title X funds while applying a parental consent requirement to services it offered itself. R. 1, R.

39 (¶ 12); *see also* R. 31 (proposed findings of fact ¶ 19); *supra* note 19.

22. *See* R. 39 ¶¶ 9–13, 30(5) (amended complaint); Transcript of Oct. 8, 1982, Hearing at 3–6; R. 31 (proposed findings of fact ¶¶ 17–19; proposed conclusions of law ¶¶ 8–16).

23. It is a well-settled rule that "[a]n appellate court has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest the affirmance 'on any ground that finds support in the record.' " *United States v. General Motors*

with Planned Parenthood that HHS regulations in their present form[24] forbid a project from refusing to serve minors whose parents do not first consent, at least when the minors are not referred to some other project receiving title X funds that does not impose such a requirement.[25] But this only supports our view that Utah's assurances that it would serve all persons previously receiving title X services, a group including unmarried minors whose parents would not furnish consent, gave HHS adequate reason to assume that the state health department would operate its program in compliance with the regulations.

As noted, HHS regulations forbid projects from discriminating in the provision of services on the basis of age. 42 C.F.R. § 59.5(a)(4) (1982). As it now stands, this prohibition unquestionably covers parental consent requirements for minors. In a 1982 proposal to amend the rules to permit states to impose such consent requirements (an amendment that certainly would not have been necessary if the age discrimination prohibition were no barrier), HHS said: projects are currently "required by 42 CFR 59.5(a)(4) to make services available to the minor to the extent it would to any otherwise similarly situated (for example, with respect to income) individual, even if the State has enacted a parental consent requirement intended to apply to Title X providers." 47 Fed.Reg. 7699, 7700 (1982).[26] This interpretation finds support in another section of the regulations, which directs projects to judge "unemancipated minors who wish to receive services on a confidential basis" on the basis of their own financial resources alone when the project determines if they are part of a low-income family, even if the family's income exceeds the normal definition. 42 C.F.R. § 59.2 (1982). Such persons are an example of those who "are unable, for good reasons, to pay for family planning services."[27] Id. It would be odd indeed if a project were required to ignore otherwise applicable income restrictions in the interests of enab-

Corp., 518 F.2d 420, 441 (D.C.Cir.1975). The parties fully argued the consent issue not only on appeal but before the District Court on a record of largely undisputed facts. Mindful of our obligation to view inferences drawn from the record in the light most favorable to the party opposing summary judgment, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), we proceed to dispose of the consent claims.

24. After we heard oral argument in this case, HHS promulgated new regulations, scheduled to take effect February 25, 1983, that will require a project to notify a parent or guardian, within ten working days, when it initially provides prescription drugs or devices to an unemancipated minor, unless notification would result in physical harm to the minor by the parent or guardian. 48 Fed.Reg. 3600, 3614 (1983) (to be codified at 42 C.F.R. § 59.-5(a)(12)). The new regulations also provide that, "[w]here State law requires the notification or consent of a parent or guardian to the provision of family planning services to an individual who is an unemancipated minor under State law," the project shall "provide such services only in the [sic] compliance with such law." Id. As the regulations have not yet taken effect, they have no bearing on the present appeal.

25. Although we do decide that the regulations forbid imposition of a consent requirement when a project does not refer minors to other title X providers, we do not decide whether use of such a referral system would bring the project turning minors away into compliance with the regulations.

26. Immediately before the quoted passage, HHS mentioned that consent may be required when a state's "underlying law of consent renders minors unable to give legally effective consent." 47 Fed.Reg. at 7700. Contrary to the government's contention on appeal, however, S.B. 3 is clearly not such a law. The state attorney general said at the July 6 meeting that private organizations not acting as delegates of the state were not barred from providing services to minors who lacked parental consent. See Appellant's Addendum at 60. Moreover, while we hesitate to attempt to interpret the bill's reach, by its terms S.B. 3 would seem inapplicable to services not supported by public funds. See supra note 3. Therefore, S.B. 3 does not as a general matter make minors unable to consent to receive family planning services and so is not the sort of "underlying law of consent" that HHS contrasted with a state's "parental consent requirement intended to apply to Title X providers." 47 Fed.Reg. at 7700.

27. The new regulation mentioned supra note 24 will eliminate this provision. See 48 Fed.Reg. 3600, 3613–14 (1983).

ling a teenager from a wealthy family to obtain services "on a confidential basis" (i.e., without telling her parents), but could refuse to serve the same teenager at all if her parents did not first consent.[28]

■ No one has argued that the age discrimination regulation as so construed violates title X. Although the statute does require grant recipients to "encourage family participation in projects" "[t]o the extent practical," 42 U.S.C.A. § 300(a) (1982), this does not appear to constrain the Secretary's discretion to adopt a regulation of this sort. The legislative history of the family participation provision made clear that "family involvement [was] not mandated." H.R.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981) (conference report), U.S. Code Cong. & Admin.News 1981, p. 396. And given that the statute expressly provides for adolescent family planning services, 42 U.S.C.A. § 300(a) (1982), we find the regulation a permissible interpretation of the extent to which family participation is "practical."[29] Thus, it seems clear that the current regulations are valid, and that they forbid Utah from denying services funded by the most recent title X grant to minors who lack parental consent.

Although Planned Parenthood has correctly interpreted the current reach of the age-discrimination regulation, it has nonetheless failed to show that the HHS grant should be set aside. It is true that HHS was on notice at the July 6 meeting that the state attorney general then intended to apply S.B. 3 to title X services administered by the state. But Planned Parenthood ignores the most important communication Utah had with the agency: its assurance on August 30 that it would provide services "to the approximately 12,000 women currently served by the three Title X grantees in Utah." R. 10 (defendant's attachment A). Those previously served included unmarried minors who lacked parental consent but were referred to Planned Parenthood and Park City for treatment, as the state well knew. HHS has represented here and below that it has no reason to doubt the sincerity of this representation. See Brief of the Defendant-Appellee at 41; Transcript of Sept. 14, 1982, Hearing at 13–15. Indeed, given the regulations whose clear meaning we have just described—regulations that take precedence over contrary state law—Utah could not have represented otherwise. Therefore, we see no reason to set aside the award when HHS could have reasonably operated on the assumption that minors lacking parental consent would be served.

Should it turn out that Utah fails to live up to its obligations under the regulations,[30] HHS may respond accordingly. As the government has reminded this court, Brief of the Defendant-Appellee at 41, and as the regional health administrator recognized, see supra p. 713, HHS has ample authority to terminate a grant administered in violation of the regulations, see 42 C.F.R. § 59.12 (1982); 45 id. § 74.115, or to take other steps as necessary, id. § 74.113(a). We have every reason to leave enforcement

---

28. On the other hand, we find unpersuasive Planned Parenthood's argument that imposition of a consent requirement violates the regulation protecting patient confidences, 42 C.F.R. § 59.11 (1982). S.B. 3 appears to deny family planning services supported by public funds to unmarried minors who lack parental consent; it does not to our knowledge require the state health department to violate patient confidences. And even if it did, we note that the regulation permits disclosures "necessary to provide services to the patient or as required by law." Id.

29. At the same time, of course, we express no opinion on whether the statute requires such a regulation.

30. Shortly before oral argument in this case, Park City informed us by affidavit that it has received a reduced level of title X funds through one county, though subject to a contractual requirement that it not serve unmarried minors who lack parental consent. Although this suggests that Utah has violated its assurances, it does not change our result here, which is premised on the reasonableness of HHS's belief in those assurances at the time it awarded the grant. As we note, HHS has adequate means to ensure compliance with department regulations, as do plaintiffs with standing to sue.

of the regulations to the agency that promulgated them. Thus, we find that Planned Parenthood has shown no reason to strike the grant to Utah, and for this reason we affirm the District Court's grant of summary judgment on the consent claims.

## V

█ We next turn to Planned Parenthood's objections based not on the fact that the grant was consolidated with an entity that had once threatened to impose a parental consent requirement but on the fact that the grant was consolidated at all. Planned Parenthood attacks the District Court's decision by repeating the major claims it made below: first, that consolidation in the state health department violated the statutory right afforded "[l]ocal and regional entities ... to apply for direct grants," 42 U.S.C. § 300(b) (1976); second, that the state health department did not adequately document that it had given the private organizations, "to the maximum feasible extent, an opportunity to participate in the development of the [consolidated] application," as required by regulation, 42 C.F.R. § 59.5(a)(10)(i) (1982); and third, that the award violated the APA and title X itself because the extent to which consolidated grants would be considered or preferred was not adequately set out in department rules.[31] The District Court rejected all three contentions, and for the reasons set out below we affirm.

The heart of Planned Parenthood's statutory argument is a 1975 Senate report accompanying the bill that, as ultimately amended, ensured local and regional entities the right to apply for direct grants. The report envisioned that HHS might consolidate grants at the community level, but seemed concerned about consolidation in state agencies: "A systematic attempt by [HHS] to consolidate local project grants under the control of state agencies and to shift a large part of the administrative responsibilities and of the decisions as to re-

source allocations to the State agencies would be contrary to the intent of the law." S.Rep. No. 29, 94th Cong., 1st Sess. 63 (1975), U.S.Code Cong. & Admin.News 1975, p. 469, 525.

The main problem with Planned Parenthood's argument is that the general views of the Senate report were never translated into a statutory norm that HHS has even arguably violated. We note in the first place that it is not the wishes of one committee that guide us but rather the directives of the full Congress as reflected in statutory language. It is noteworthy that the bill reported out of the Senate committee that authored this report did not contain any language even arguably expressing hostility to consolidated grants, not even the language protecting the right to apply for direct grants. See id. at 220 (language of S. 66). Thus, the Senate committee seemed content informally to express its wishes to the agency without supporting those wishes with a recommendation of binding statutory language for consideration by the full Senate. The provision ultimately added to protect the right to apply for direct grants originated instead in a House amendment. See 121 Cong.Rec. 17,-224 (1975) (§ 204(b)). Although this language did indeed seem addressed to the same concerns that the Senate committee voiced, see H.R.Rep. No. 192, 94th Cong., 1st Sess. 31–32 (1975) (discussing H.R. 4925, in lieu of which Congress passed S. 66 as amended), the provision finally adopted protects only the right to *apply* for direct grants, and it is clear that Planned Parenthood fully exercised this right. Originally, the amendment enacted by the House required that local and regional entities be "assured the right to apply for, *and be direct recipients of,*" title X grants. See 121 Cong.Rec. 17,224 (1975) (§ 204(b)) (emphasis added); *accord* H.R.Rep. No. 192, *supra*, at 187 (language of H.R. 4925). But in conference the right to re-

---

**31.** Although before the District Court Planned Parenthood attacked the award decision on its merits, alleging that HHS failed to take due account of Planned Parenthood's past record and succumbed to improper political pressures, it has not pressed these arguments on appeal, so we have no occasion to examine the District Court's disposition of these contentions.

ceive direct grants was deleted. H.R.Rep. No. 348, 94th Cong., 1st Sess. 76 (1975) (conference report).[32] Congress's conscious decision to pare down this language makes us hesitate to read more into the statute than is explicitly there.[33]

Planned Parenthood has thus admitted that grants consolidated even at the state level are not categorically forbidden. *See* Transcript of Sept. 14, 1982, Hearing at 27–28. Yet the right to apply for direct grants, it insists, at least forbids HHS from adopting an irrebutable presumption against direct grants. This argument strikes us as beside the point, however, for there is no evidence that HHS used such a presumption in this case. HHS has shown that it views each consolidated grant application on its own merits and has articulated in detail reasons why it found Utah's particular grant proposal appealing. *See supra* pp. 715–16.

 An additional problem with Planned Parenthood's statutory argument, as the District Court found, is that it ignores Congress's 1981 declaration that, in "coordinat[ing] Federal policies and programs providing services relating to the prevention of . . . adolescent pregnancies," the Secretary should "give priority in the provision of funds, where appropriate, to applicants using single or coordinated grant applications for multiple programs." 42 U.S.C.A. § 300z–6(a)(4) (1982). Planned Parenthood asserts that this directive applies only to the adolescent family life demonstration projects established in *id.* §§ 300z–2 to –5. Yet the purpose of the statute was not only to establish new programs, like the demonstration projects, but also to encourage "better coordination of *existing* services where they are available." *Id.* § 300z(a)(10)(B) (emphasis added). As the legislative history indicates, HHS was given authority "to review *all* programs which provide prevention services and programs of care for pregnant adolescents," and to "determine the degree of duplication and philosophical consistency existing in current Federal programs including family planning." S.Rep. No. 161, 97th Cong., 1st Sess. 16 (1981) (emphasis added). We thus see no reason to ignore the obvious fact that title X, though serving adults as well, is literally a federal program "providing services relating to the prevention of . . . adolescent pregnancies," 42 U.S.C.A. § 300z–6(a) (1982). Moreover, we see no reason to accept Planned Parenthood's contention that the directive to prefer coordinated applications for "multiple programs" is limited to coordination between title X

**32.** The conference committee explained this deletion as a way to clarify that a local entity would not have a right to a grant if it were not "qualified and able to meet the requirements and regulations" of title X. H.R.Rep. No. 348, *supra,* at 76, U.S.Code Cong. & Admin.News 1975, p. 665. This does not imply by negative inference, however, that "qualified" local entities were still guaranteed the right to receive direct grants, for obviously there might be more qualified local entities than there is money available. And it would be difficult to retreat this far but still maintain that Congress intended qualified local applications for direct grants to receive preference over applications for consolidated grants. The deletion shows that the conference committee understood the difference between the right to apply for a grant and the right to receive a grant, and had it intended a statutory preference for direct grants it could easily have made a more limited deletion than it did. Moreover, even the House committee that reported the bill including the right to *receive* direct grants seems to have contemplated that consolidation awards would

be permitted "[w]hen consolidation is deemed desirable," as long as eligible grantees could participate in the decisionmaking of the program. H.R.Rep. No. 192, *supra* p. 723, at 32; *see infra* note 33 (similar qualification in committees' reservations specifically about grants consolidated in state agencies).

**33.** We note further that the committee reports themselves are not hostile simply to consolidation of grants in state agencies but to state consolidation in conjunction with a shift of "administrative responsibilities and of the decisions as to resource allocations to these State agencies." S.Rep. No. 29, *supra* p. 723, at 63, U.S.Code Cong. & Admin.News 1975, p. 525; *accord* H.R.Rep. No. 192, *supra* p. 723, at 32. HHS has taken steps by regulation to forbid state usurpation of decisionmaking by requiring projects to provide "an opportunity for maximum participation by existing or potential subgrantees in the ongoing policy decisionmaking of the project." 42 C.F.R. § 59.5(a)(10)(ii) (1982).

and other programs and does not extend to coordination of projects within title X itself.[34] And while it is true that the preference for coordinated applications only applies "where appropriate," we have found nothing in the language of title X that declares considered consolidation of a grant in a state agency inappropriate. Therefore, we find that HHS had ample statutory authority to award Utah a consolidated grant under the circumstances.

We move next to Planned Parenthood's contention that it was not afforded an adequate opportunity to participate in the development of the consolidated grant application that HHS ultimately favored. Planned Parenthood does not dispute that it had ample opportunity to attempt to formulate an application with the state health department for a grant in which the three previous grantees would all play a role as service providers. As explained earlier, the participants at the July 6 meeting explored this option in great detail but decided it was not feasible. What it was denied, Planned Parenthood claims, was an opportunity to work with Utah to develop and influence the particulars of the application Utah did submit, even though Planned Parenthood and Park City might not have been able to provide services themselves under the grant. Planned Parenthood objects to the District Court's finding that the July 6 meeting was a fair chance to do this, because Utah said at that time it was not going to resubmit its application. How could Planned Parenthood be expected to participate in the development of an application that Utah said it was not going to submit?

Planned Parenthood's objection is flawed in several respects. First, Planned Parenthood knew better than to draw any significance from the mere fact that Utah was happy to continue under the old funding approach. As it well knew, HHS had gone to some lengths to get Utah to turn its application for all funds into a bona fide consolidated grant application. HHS extended the award date sixty days to enable Utah to perfect a consolidated grant application, even though, as Planned Parenthood realized, Utah itself might not have viewed its March application as different from its applications in years past. Going into the July 6 meeting, therefore, Planned Parenthood should have realized that the consolidated grant idea would not necessarily die simply because Utah did not enthusiastically embrace it. Moreover, Planned Parenthood could not for long have thought that Utah's decision not to "resubmit" its application meant that HHS would not have a consolidated application to consider. HHS told Planned Parenthood shortly after the July 6 meeting that no final decision on consolidation had been made. This put Planned Parenthood on notice that HHS was viewing Utah's March application as a request to consolidate the title X award, for this was the only pending application seeking all the funds and Planned Parenthood knew that Utah was not submitting any new applications. Knowing this, Planned Parenthood could not have expected that its opportunity to participate in the development of a consolidated application would accompany some future application; it was bound to realize instead what it was told before the July 6 meeting, namely, that this meeting would be its chance to participate as guaranteed by department regulations. Indeed, HHS suggested in its letter of July 15 that the July 6 meeting had served its purpose: it called the meeting "constructive" and thanked Planned Parenthood for its "participation ... prior to our making any final decisions." R. 1 (plaintiff's attachment 8). If Planned Parenthood had a genuine interest at this point in helping to develop the application for a grant in which it thought it would not itself provide serv-

---

**34.** Even if the preference did not extend directly to coordination of programs within title X, a preference for coordination between title X and other programs might indirectly favor title X consolidation in state agencies, which could submit applications coordinating title X with other federal programs they administer that relate to family planning. *See* Martin Deposition at 160 (praising advantages of "the ability to coordinate title V, X and XX dollars in an integrated state system of family planning services").

ices, it could have taken steps at that time to approach the state health department or to inform HHS that it thought a further opportunity for participation in the development of the application was feasible.

A final problem with Planned Parenthood's objection is that Planned Parenthood had given HHS every reason to think it wanted little to do with a consolidated grant approach. Planned Parenthood would have us hold that on August 30, when HHS had finally received all assurances from Utah necessary to enable it to approve the consolidated application and when the sixty-day delay in awarding the grant was about to expire, HHS should have delayed the grant award still further to give an organization which thought consolidation was not even worth "seriously considering" yet another chance to participate in the development of a grant application that could probably not include it as a service provider and that was competing with its own application for a direct grant. We agree with the District Court that HHS could reasonably have thought further efforts would be futile and that under the circumstances HHS had at this point already provided opportunities for participation "to the maximum feasible extent." Planned Parenthood gambled that its opposition to consolidation would doom it, but lost that gamble. If it wants to play a further role, it is guaranteed by regulation "an opportunity for maximum participation . . . in the ongoing policy decisionmaking of the project," 42 C.F.R. § 59.5(a)(10)(ii) (1982).[35] But we will not further hold up this process on the theory that Planned Parenthood was not given an adequate chance to participate in the development of Utah's application.

 Finally, we find little merit in Planned Parenthood's third objection to the award of a consolidated grant: that the agency was required to promulgate rules concerning its "policy" favoring consolidated grants that serve the interests of efficiency. Planned Parenthood points first to title X's requirement that grants "shall be made in accordance with such regulations as the Secretary may promulgate." 42 U.S.C. § 300a–4(a) (1976). Planned Parenthood would have us emphasize the word "shall" and ignore the fact that all the Secretary "shall" do is make grants in accordance with such regulations as he "may" promulgate. We have already explained why the grant was in accordance with existing regulations, so we need detain ourselves with this argument no further. Planned Parenthood also argues that HHS's preference for consolidated grants is a "binding norm" that must be promulgated in accordance with APA rulemaking requirements. *See American Bus Association v. United States,* 627 F.2d 525, 528–31 (D.C. Cir.1980). Yet, as HHS has shown, it does no more than favor consolidated grant applications where appropriate. This much it is already required to do by statute, *see* 42 U.S.C.A. § 300z–6(a)(4) (1982), however, and we see little reason for the agency to promulgate a rule declaring it will do what it is statutorily bound to do. And in any event Planned Parenthood has not shown that HHS's consolidation "preference" rises to the level of a command that constrains its administrative exercise of discretion. *See American Bus Association,* 627 F.2d at 529.

## VI

For the foregoing reasons, we affirm the District Court's grant of the defendant's motion for summary judgment.[36]

*It is so ordered.*

---

**35.** This right extends to "existing or potential subgrantees." 42 C.F.R. § 59.5(a)(10)(ii) (1982). Because Park City is already serving as a subgrantee, *see supra* note 30, the appellants are presumably part of this group.

**36.** Finding summary judgment appropriate, we need not address the District Court's denial of Planned Parenthood's motion for a preliminary injunction and the court's accompanying findings that the plaintiffs had failed to show the irreparable harm necessary for a preliminary injunction and that a weighing of interests counseled against the grant of a preliminary injunction. We also do not decide HHS's additional argument in support of the District

Court's judgment: that dismissal was appropriate on rule 19 grounds.

The appellants have also made two contentions unique to Park City's role in this litigation that we reject or fail to reach. First, we decline to disturb the grant of summary judgment on the ground that Park City, as opposed to Planned Parenthood, did not have a sufficient opportunity to develop the record. When it sought to intervene, Park City represented and agreed that intervention would not "unduly delay" the proceedings and that it would "neither increase nor change the issues to be adjudicated." R. 24. Finding as we do that Planned Parenthood had sufficient opportunity to develop the record, we necessarily reach the same conclusion for Park City. Second, because we hold that the District Court erred in failing to consider Planned Parenthood's consent claims under the amended complaint, we need not consider the argument that Park City joined only in the original complaint and therefore that the District Court should have at least considered the consent claims raised by Park City.