PLANNED PARENTHOOD FEDERA-
TION OF AMERICA, INC., et al.

v.

Margaret M. HECKLER, Secretary, U.S.
Department of Health and Human
Services, Appellant.

NATIONAL FAMILY PLANNING AND
REPRODUCTIVE HEALTH
ASSOCIATION, Inc., et al.

v.

DEPARTMENT OF HEALTH AND HU-
MAN SERVICES et al., Appellants.

Nos. 83–1232, 83–1239.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1983.

Decided July 8, 1983.

Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., and Leonard Schaitman and William G. Cole, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellants.

Nancy L. Buc, Washington, D.C., for appellees Planned Parenthood Federation of America, Inc., et al. Scott T. Maker, Washington, D.C., entered an appearance for appellees Planned Parenthood Federation of America, Inc., et al.

John W. Nields, Jr., Washington, D.C., with whom Deborah V. Swirling, Washington, D.C., was on the brief, for appellees Nat. Family Planning and Reproductive Health Ass'n, Inc., et al.

William J. Olson and James E. Gates, Washington, D.C., were on the brief for amici curiae Jeremiah A. Denton et al., urging reversal.

Ruth J. Katz, Philadelphia, Pa., was on the brief for amicus curiae U.S. Congressman Henry A. Waxman, urging affirmance.

Sana F. Shtasel, Washington, D.C., was on the brief for amicus curiae U.S. Senator Bob Packwood, urging affirmance.

Elizabeth Symonds, Washington, D.C., was on the brief for amici curiae American Public Health Ass'n et al., urging affirmance.

Before WRIGHT, EDWARDS and BORK, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Opinion concurring in part and dissenting in part filed by Circuit Judge BORK.

J. SKELLY WRIGHT, Circuit Judge:

At issue in this case is the validity of regulations recently issued by the Secretary of the Department of Health and Human Services (HHS) requiring all providers of family planning services which receive funds under Title X of the Public Health Service Act (Title X)[1]: (1) to notify parents or guardians within ten working days of prescribing contraceptives to unemancipated minors; (2) to comply with state laws requiring parental notice of, or consent to, the provision of any family planning services to minors; and (3) to consider minors who wish to receive services on the basis of their parents' financial resources, rather than their own.[2] Numerous organizations and individuals joined in a consolidated action in the District Court to enjoin the Secretary from enforcing these regulations. The lower court entered a preliminary, and then a final, injunction prohibiting enforcement of the new regulations on the ground that they constitute invalid agency action in excess of statutory authority. Because we agree that the regulations are fundamentally inconsistent with Congress' intent and purpose in enacting Title X and are therefore beyond the limits of the Secretary's delegated authority, we affirm the decision below.

## I. BACKGROUND

### A. *The Statute and Regulations*

In 1970 Congress enacted Title X of the Public Health Service Act to establish a nationwide program with the express purpose of making "comprehensive family planning services readily available to all persons desiring such services."[3] Congress authorized the Department of Health, Education and Welfare (HEW) to make grants and enter into contracts with public or non-

---

1. 42 U.S.C. § 300 *et seq.* (1976 & Supp. V 1981).

2. The final regulations are published at *Parental Notification Requirements Applicable to Projects for Family Planning Services,* 48 Fed. Reg. 3600, 3614 (Jan. 26, 1983) (hereinafter *Final Rules*), and are to be codified at 42 C.F.R. §§ 59.5(a)(12)(i), (ii) and 59.2.

3. Pub.L. No. 91–572, § 2, 84 STAT. 1506 (1970) (statement of the "purpose of this Act"). Title X was entitled the "Family Planning Services and Population Research Act" and has been codified as amended at 42 U.S.C. § 300 *et seq.* (1976 & Supp. V 1981).

profit entities to assist in the establishment of family planning projects that offer a broad range of family planning methods, including the provision of prescription and nonprescription contraceptive drugs and devices. *See* 42 U.S.C. § 300(a) (as amended). The Title X program was originally funded for three years, but has since been reauthorized and refunded continuously.[4]

In light of the breadth of the statutory language and clear congressional intent that *all* persons receive such services,[5] Title X grantees have served the teenage population from the inception of the program. Following enactment of Title X, however, Congress frequently expressed its increasing concern about the still unmet family planning needs of sexually active teenagers in this country. *See, e.g.,* H.R.Rep. No. 1161, 93d Cong., 2d Sess. 14 (1974) ("certain population groups requiring these services are not being reached * * * includ[ing] teenagers"); S.Rep. No. 29, 94th Cong., 1st Sess. 55 (1975). Ultimately, Congress in 1978 amended the statute itself to require that Title X projects offer "a broad range of acceptable and effective family planning methods and services (*including * * * services for adolescents*)." *See* 42 U.S.C. § 300(a) (emphasis added). While this amendment simply codified accepted past practice, the added language clearly reflected Congress' intent to place "a special emphasis on preventing unwanted pregnancies among sexually active adolescents."

S.Rep. No. 822, 95th Cong., 2d Sess. 24 (1978).[6]

In 1981 Congress again amended Title X, this time to require by statute that grantees encourage family participation in their Title X programs. With this additional language, Section 300(a) of the Act now reads:

> The Secretary is authorized to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents). *To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.*

42 U.S.C. § 300(a) (amendment emphasized).

On February 22, 1982 the Secretary published for public comment modifications of certain regulations governing Title X grants. Proposed as a means of implementing Congress' 1981 amendment to Title X,[7] the new regulations seek to mandate the encouragement of family participation in three basic ways. First, and most significantly, they require Title X grantees to notify a parent or guardian within 10 working days of initially prescribing contraceptives to an unemancipated minor.[8] Without

---

**4.** *See* Pub.L. No. 93–45, § 111(a), 87 Stat. 93 (1973); Pub.L. No. 94–63, § 202(b), 89 Stat. 304, 306 (1975); Pub.L. No. 95–83, § 305(b), 91 Stat. 389 (1977); Pub.L. No. 95–613, § 1(b), 92 Stat. 3093 (1978); Pub.L. No. 97–35, § 931(a), 95 Stat. 357 (1981).

**5.** *See* Pub.L. No. 91–572, § 2, 84 Stat. 1506 (1970); S.Rep. No. 1004, 91st Cong., 2d Sess. 3 (1970).

**6.** *See also* H.R.Rep. No. 1191, 95th Cong., 2d Sess. 31 (1978):

The Committee is committed to addressing the increased needs of adolescents and young adults. According to DHEW, approximately one million women under 20 years of age (10 percent of all teenage women) become pregnant annually. * * * Such pregnancies are

often unwanted, and are likely to have adverse health, social, and economic consequences for the individuals involved. Clearly, the problems of teenage pregnancy have become critical.

**7.** *See Requirements Applicable to Projects for Family Planning Services,* 47 Fed.Reg. 7699 (Feb. 22, 1982).

**8.** The final version of the regulation provides:

When prescription drugs or prescription devices are initially provided by the project to an unemancipated minor, notify a parent or guardian that they were provided, within 10 working days following their provision. The project must tell the minor prior to the provision of services about this notification requirement. As used in this subsection, the

verification that such notice was received, no further prescriptions may be provided to the minor.[9]

Second, the regulations require Title X recipients to comply with any *state* law that mandates notification or consent of parent or guardian upon provision of family planning services to a minor.[10] Finally, the new regulations redefine the statutory phrase "low-income family" so as to require Title X grantees to consider the economic eligibility of minors on the basis of their parents', rather than their own, financial resources.[11]

As the Department itself acknowledged, public response to the proposed regulations was "overwhelming." [12] Over 120,000 individuals and organizations contributed to the public comment.[13] Among those opposing the proposed regulations were 19 major medical associations, including the American Medical Association and the American Psychiatric Association, 40 states, and the District of Columbia. On January 26, 1983 HHS nevertheless promulgated the final regulations, virtually unchanged.[14] They were accompanied by a 15-page preamble that generally discussed the comments submitted and the reasons for the new rules.[15] The regulations were to take effect on February 25, 1983.

### B. *The Proceedings and Decisions Below*

Even before the final regulations were published, however, two separate actions were brought in the District Court to enjoin the Secretary [16] and the Department from enforcing the regulations. Plaintiffs in one action were the Planned Parenthood Federation of America, Inc., a national organiza-

---

phrase "parent or guardian" shall refer to a parent or guardian residing with the minor or otherwise exercising ordinary parental functions with respect to the minor. The project shall verify by certified mail (with restricted delivery and return receipt requested), or other similar form of documentation, that the notification has been received. Where the project is unable to verify that notification was received, the project shall not provide additional prescription drugs or devices to the minor.

*Final Rules,* 48 Fed.Reg. at 3614.(to be codified at 42 C.F.R. § 59.5(a)(12)(i)(A)).

An "unemancipated minor" is defined for purposes of the notification requirement as "an individual who is age 17 or under and is not, with respect to factors other than age, emancipated under state law." *Id.* (to be codified at 42 C.F.R. § 59.5(a)(12)(i)(C)).

**9.** The final regulations also provide for two exceptions from the parental notification rule. First, no notice is required when it is determined that such notice will result in physical harm to the minor. *See Final Rules,* 48 Fed. Reg. at 3614 (to be codified at 42 C.F.R. § 59.5(a)(12)(i)(B)). Second, no notice is required when prescription drugs are provided for the treatment of venereal disease. *See id.* (to be codified at 42 C.F.R. § 59.5(a)(12)(i)(E)). *See generally id.* at 3609–3612.

**10.** The final regulations provide that Title X family planning projects shall:

Where State law requires the notification or consent of a parent or guardian to the provision of family planning services to an individual who is an unemancipated minor under State law, provide such services only in the compliance with such law.

*Final Rules,* 48 Fed.Reg. at 3614 (to be codified at 42 C.F.R. § 59.5(a)(12)(ii)).

**11.** The final regulations delete the last sentence of the existing regulation, 42 C.F.R. § 59.2 (1982), that defined "low income family":

"Low income family" means a family whose total annual income does not exceed 100 percent of the most recent Community Services Administration Income Poverty Guidelines (45 CFR 1060.2). "Low-income family" also includes members of families whose annual family income exceeds this amount, but who, as determined by the project director, are unable, for good reasons, to pay for family planning services. *For example, unemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources.*

(Deleted sentence emphasized.) *See Final Rules,* 48 Fed.Reg. at 3614.

**12.** *Final Rules,* 48 Fed.Reg. at 3600.

**13.** *Id.*

**14.** The final version of the regulations differed only slightly from the proposed rules in that certified mail was specified as the preferred method of notification and notification of just one parent or guardian would suffice.

**15.** *Final Rules,* 48 Fed.Reg. at 3600–3614.

**16.** Secretary Richard S. Schweiker was the original defendant in this suit. He has since been succeeded by Margaret M. Heckler.

tion concerned with family planning, and three of its member affiliates who receive Title X grants to provide family planning services and are therefore subject to the new regulations.[17] The second suit was brought by the National Family Planning and Reproductive Health Association, Inc. (NFPRHA), a national nonprofit organization whose members are predominantly family planning clinics receiving Title X funding, and numerous other organizations and individuals affected by the regulations.[18] The District Court consolidated the two actions.

On February 18, 1983 the District Court granted plaintiffs' consolidated motions for preliminary injunction, ordering the Secretary and the Department to cease enforcement of the challenged regulations pending further order of the court.[19] *See Planned Parenthood Federation of America, Inc. v. Schweiker*, 559 F.Supp. 658 (D.D.C.1983) (hereinafter cited as *Planned Parenthood* ). In addressing plaintiffs' likelihood of success on the merits, the court reviewed the statutory language of the 1981 amendment to Title X, its legislative history, and the general structure of Title X. The court concluded that the regulations requiring parental notification "are outside the scope of the agency's authorizing legislation, and are

therefore invalid." *Id.* at 669. The court also held that the other two requirements—compliance with state parental notification and consent laws and redefinition of adolescent financial eligibility—are similarly invalid for violating the intent of Title X. *Id.* Since the court found that the regulations were promulgated in excess of statutory authority, it did not rule on plaintiffs' allegations that the regulations are arbitrary and capricious and abridge the constitutional privacy rights of mature minors. *See id.* at 669 n. 19. On March 2, 1983 the court found that plaintiffs were entitled to judgment as a matter of law and so filed a final order in the case, making its injunction permanent. *See id.* at 670 (final judgment on cross-motions for summary judgment).[20]

### III. ANALYSIS

This appeal presents a straightforward issue of statutory construction.[21] Urging reversal of the decision below, appellants, the Secretary and HHS, argue that the new regulations are perfectly consistent with the language and intent of the 1981 amendment to Title X and are therefore not in excess of statutory authority. Before addressing the merits of this assertion, we outline briefly this court's scope of review.

---

**17.** The member affiliates are: Planned Parenthood of Metropolitan Washington, D.C., Inc., Planned Parenthood of New York City, Inc., and Planned Parenthood of Maryland, Inc. Also named as party plaintiffs are Dr. Laurel A. Cappa, Medical Director of the Washington, D.C. affiliate, and four pseudonymous individuals—two 16-year-old girls, a mother of an unemancipated minor, and a father of an unemancipated minor.

**18.** The other parties to this suit are: the Family Planning Council of Western Massachusetts, Inc. (one of the members of NFPRHA), the United States Conference of Local Health Officers, the South Carolina Department of Health and Environmental Control, and Dr. Steven Sondheimer, Director of the Family Planning Program at the Hospital of the University of Pennsylvania. The Association of Planned Parenthood Professionals, Inc. subsequently joined as a plaintiff in this action.

**19.** The court also granted motions by both Planned Parenthood and NFPRHA for class certification. *See Planned Parenthood Federation of America, Inc. v. Schweiker*, 559 F.Supp.

658, 661–663 (D.D.C.1983) (hereinafter cited as *Planned Parenthood* ).

**20.** The only other courts to rule on the validity of these regulations have similarly enjoined their enforcement. *See State of New York v. Schweiker*, S.D.N.Y. Civil No. 83–0726 (March 7, 1983) (holding regulations invalid as contrary to intent and purpose of Title X), *appeal pending sub nom. State of New York v. Heckler*, 2d Cir. No. 83–6073; *Memphis Ass'n for Planned Parenthood v. Schweiker*, W.D.Tenn. Civil No. 83–2060 (Feb. 24, 1983) (preliminary injunction).

**21.** Given our affirmance of the District Court's disposition of the case on statutory grounds, we likewise find it unnecessary to decide the other issues raised by the parties—*i.e.,* whether the regulations constitute arbitrary and capricious action in violation of § 706(2)(A) of the Administrative Procedure Act and whether they violate the constitutional privacy rights of minors.

## A. Standard of Review

An essential function of the reviewing court is to guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority.[22] To that end, it falls within the province of this court to interpret the proper limits of Congress' delegation of authority in Title X and to determine whether the challenged regulations traverse those limits. As appellants duly point out, the rulemaking authority that Congress has delegated to the Secretary is broad indeed:

> Grants and contracts made under this subchapter [42 U.S.C. § 300 *et seq.*] shall be made in accordance with such regulations as the Secretary may promulgate.
> * * *

42 U.S.C. § 300a–4(a).

■ Yet, however sweeping this delegation of authority, it is not unlimited. We will declare regulations in excess of statutory authority if they "bear[ ] no relationship to any recognized concept of" the particular statutory terms at issue. *Batterton v. Francis,* 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). Agency action must be found to be consistent with the congressional purposes underlying the authorizing statute. *See id.; Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794,

1802, 23 L.Ed.2d 371 (1966). In short, these regulations can be sustained only if this "reviewing court [is] reasonably able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown,* 441 U.S. 281, 308, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 (1979).

Appellants further contend that, in construing the reaches of Title X, we must give great deference to the Secretary's own interpretation of the statute.[23] While courts frequently do give substantial deference to the administering agency's interpretation of its statute,[24] the deference accorded does vary from case to case,[25] and under certain circumstances can dissipate altogether:

> [D]eference must have limits where, as here, application of the [agency's statutory interpretation] would be inconsistent with an obvious congressional intent * *. Courts need not defer to an administrative construction of a statute where there are "compelling indications that it is wrong."

*Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–340, 38 L.Ed.2d 287 (1974) (*quoting Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 381, 89 S.Ct. at 1802).[26]

In the present case there are indeed "compelling indications" that the Secretary has misconstrued Congress' intent in enacting the 1981 amendment to Title X. Our own careful review of the language of the

---

**22.** Pursuant to the Administrative Procedure Act, a reviewing court shall "hold unlawful and set aside agency action * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C) (1976).

**23.** *See* brief for appellants at 15.

**24.** *See, e.g., FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).

**25.** *See Nat'l Wildlife Federation v. Gorsuch,* 693 F.2d 156, 166–170 (D.C.Cir.1982) (discussing factors that may support giving deference to an agency's statutory construction); *Wilderness Society v. Morton,* 479 F.2d 842, 866 (D.C.

Cir.) (*en banc*), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

**26.** As the Supreme Court has often reminded us:

> [C]ourts are the final authorities on issues of statutory construction * * * and "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."

*Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (*quoting NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). *See also Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1422–1424 (D.C.Cir.1983).

statute and its legislative history makes it clear that these regulations not only violate Congress' specific intent as to the issue of parental notification, but also undermine the fundamental purposes of the Title X program. It is to this statutory analysis we now turn.

### B. *The 1981 Amendment to Title X and Parental Notification*

#### 1. *Statutory language.*

"[T]he starting point for interpreting a statute is the language of the statute itself." *CPSC v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The 1981 amendment to Title X consists of just one simple sentence:

> To the extent practical, entities which receive grants or contracts under this subsection shall encourage family participation in projects assisted under this subsection.

42 U.S.C. § 300(a) (Supp. V 1981).

According to the Secretary, the statute's use of the word "shall" imposes a nondiscretionary duty upon Title X grantees to communicate with the teenager's parents so as to involve them in their child's contraceptive decisions.[27] We cannot agree. Certainly the use of the word "shall" presumptively implies some type of mandatory obli-

gation on grantees.[28] But the nature of that obligation is defined by the word "encourage." As the District Court noted, Congress' choice of this permissive and nonobligatory term is in itself revealing.[29] Had Congress intended to mandate parental involvement, it could easily have done so with more appropriate and less ambiguous language such as "shall *require* family participation" or "shall *notify* the family." [30]

Indeed, the very concept of encouragement is further weakened by the use of a qualifier "to the extent practical." While no specific content may be given that phrase from the face of the statute,[31] its use indicates Congress' intent that the goal of encouraging family participation may well have to give way to other, more practical considerations. Contrary to appellant's assertions, then, the express language of the statute certainly does not lend support to the Secretary's interpretation of the amendment as "reasonably contemplat[ing]" a parental notification requirement.

#### 2. *The legislative history.*

Our inquiry into the congressional intent behind the 1981 amendment need not end with a simple parsing of the express terms of the statute. Although we find that the "plain meaning" of the statute is clear from its terms, we note that the legislative histo-

---

**27.** *See* brief for appellants at 18–19.

**28.** *See, e.g., Ass'n of American Railroads v. Costle,* 562 F.2d 1310, 1312 (D.C.Cir.1977); *Sierra Club v. Train,* 557 F.2d 485, 489 (5th Cir. 1977). *See generally* C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION § 57.03, at 415–417 (4th ed. 1973).

**29.** The District Court found that:

> [T]he use of a permissive and nonobligatory term such as "encourage" reflects Congress' intent to counsel grantees to advise participants to involve their families in contraception decisions. Its use does not suggest that Congress intended to require family participation in such decisions.

*Planned Parenthood, supra* note 19, 559 F.Supp. at 667.

**30.** Congress knew very well how to write a statute that mandates parental notification. In Title XX of the same Act, 42 U.S.C. § 300z *et seq.* (Supp. V 1981), Congress established a

new program of "demonstration grants" for various services and research relating to adolescent sexuality and pregnancy. This limited program contains an explicit statutory parental notification requirement: an application for a grant shall include assurance that "the applicant will notify the parents or guardians of any unemancipated minor requesting services from the applicant * * *." 42 U.S.C. § 300z–5(a)(22)(A)(i).

The comparison and relationship between the Title X and Title XX programs are discussed at pp. 661–663 *infra.*

**31.** Appellants argue that this phrase "clearly" refers to such "demonstrably impractical" situations as where the "encouragement" by notice to parents might result in physical harm to adolescents. *See* brief for appellants at 19. This interpretation is certainly not discernible from the statutory language alone. In our view, a far more likely reading of the phrase relates to Congress' concern for protecting the confidences of adolescents who seek services from Title X clinics. *See* pp. 659–661 *infra.*

ry is equally illuminating in this case.[32] In particular, because appellants attach meaning to the fact that the statute does not expressly indicate precisely *how* Title X entities "shall encourage" family participation, reference to the legislative history is essential.

### a. *The 1981 Conference Committee report.*

The Conference Committee report accompanying the 1981 amendment specifically addressed the new sentence:

> The conferees believe that, *while family involvement is not mandated,* it is important that families participate in the activities authorized by this title as much as possible. It is the intent of the conferees that *grantees will encourage participants* in Title X programs to *include their families* in counseling and involve them in decisions about services.

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981) (emphasis added).

We find this Conference Report statement to be a crystal-clear and unequivocal expression of congressional intent—an intent that controls the Secretary in the exercise of her or his rulemaking authority.[33] Several points emerge from the Conference Committee's explanation of the amendment. In enacting the amendment to encourage family participation, Congress most definitely did *not* intend to *mandate* family involvement.[34] It is impossible to conceive of a more intelligible way to convey that meaning than the comment made by the committee. Thus, to the extent that the parental notification requirement of the new regulations operates to *require* family involvement, it is inconsistent with Congress' intent.[35]

Furthermore, the conferees quite plainly explicate the manner by which they intend the Title X grantees to fulfill their statutory obligation to encourage family participation: "*grantees* will encourage *participants* * * * to include *their* families." The Title X family planning projects are thereby directed to communicate with and encourage those seeking services to make their contraceptive choices with the assistance of their families. There is simply no way, in light of the conferees' explanation, that the statute can be read as intending to permit the Title X projects to communicate *directly* with the parents as a means of fulfilling the statute's "family participation" directive.[36]

Yet this is precisely the reading of the statute and the Conference Committee re-

---

**32.** One commentator has stated that, despite ritualistic incantations of the "plain meaning rule," "[n]o occasion for statutory construction now exists when the [Supreme] Court will *not* look at the legislative history." *See* Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L.Rev. 195 (1983) (emphasis in original). *See, e.g., FBI v. Abramson,* 456 U.S. 615, 625 & n. 7, 102 S.Ct. 2054, 2061 & n. 7, 72 L.Ed.2d 376 (1982); *Watt v. Alaska,* 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678 n. 9, 68 L.Ed.2d 80 (1981); *Nat'l Wildlife Federation v. Gorsuch, supra* note 25, 693 F.2d at 170–171.

**33.** *See* Part II–A *supra.*

**34.** Indeed, this court has already noted that "[t]he legislative history of the family participation provision made clear that 'family involvement [was] not mandated.' " *Planned Parenthood Ass'n of Utah v. Schweiker,* 700 F.2d 710, 722 (D.C.Cir.1983) (*citing to* the conference report).

**35.** The Secretary attempts to escape this conclusion by arguing that a regulation requiring parental notification will *not* "invariably re-

sult" in family participation as the District Court found. *See Planned Parenthood, supra* note 19, 559 F.Supp. at 668. Instead, appellants contend that the parental notification regulation "does not prevent any parent or guardian who receives a notice from refusing to become involved in any way in decisions about a child's sexual activities. The regulation * * * merely provides the opportunity for participation if the parent elects to become involved." Brief for appellants at 25–26. This argument belies common sense. If a parent is notified that his or her child has received a prescription contraceptive, the parent is at that point "involved" in the child's contraceptive decisionmaking. The extent and impact of that involvement may not be predictable, but some type of parental involvement is a logical concomitant of the regulation's parental notification requirement.

**36.** We emphasize that this Conference Committee statement is especially persuasive evidence of congressional intent. First, a Conference Committee report represents the final word on the final version of a statute. It must be signed by a majority of both delegations

port that the Secretary would urge upon this court. Appellants seek to avoid the clear import of the Conference Committee report by arguing that enactment of the 1981 amendment represented a great change in Congress' existing policy *vis-à-vis* parental notification and family involvement—a change in policy that would be furthered by the new regulations. They contend that the 1981 amendment "showed a clear shift in Congress' thinking. * * * Congress indicated that grantees, themselves, were henceforth to encourage family involvement, and not simply to rely on their teenage clientele to involve their parents." [37] According to appellants, Congress' shift in intent is supposedly manifest, not only in the express language of the statute, but in the Conference Committee report's introductory statement about Title X:

> Three *changes* were made in Title X by the conferees. The first was a statement added to section 1001 that "To the extent practical, recipients of grants shall encourage family participation." * * *

H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 799 (1981) (emphasis added).[38]

Appellants' argument simply does not withstand close scrutiny. The conferees' use of this word "changes" certainly cannot stand alone as definitive proof of a fundamental shift in congressional intent. Assuredly, there was a "change" in Title X—an entirely new sentence was added to the section of the Act. Whether this change of statutory language evidences a change of congressional purpose, however, depends upon Congress' prior expressions of policy as to the issues of family involvement and parental notification.[39]

### b. *Congressional policy of encouraging family involvement.*

Our detailed examination of Title X's pre-1981 legislative history indicates that, far from signifying a shift in congressional opinion, the 1981 amendment simply raised to the statutory level pre-existing policy on this issue. For years earlier Congress had evinced its strong interest in encouraging family involvement in a teenager's family planning decisions; the legislative history is replete with references to this goal. What is particularly striking is the extent to

from the House and Senate who have resolved the differences between the two chambers. For that reason, Conference Committee reports are considered "particularly weighty" indicators of congressional intent. *See generally* Wald, *supra* note 32, 68 Iowa L.Rev. at 201 & n. 49. Second, commentators have long debated just how realistic and meaningful it is to attribute a *specific* legislative intent or meaning to the action of a deliberative body. *See, e.g.,* C. Sands, *supra* note 28, § 45.08, at 22–28; Note, *Intent, Clear Statements, and the Common Law: Statutory Interpretation in the Supreme Court,* 95 Harv.L.Rev. 892 (1982). One of the classic works in the field would limit the search for legitimately relevant legislative history by asking the following question:

> "Did the legislator in establishing this determinable [the general proposition set out in the statutory text] have a series of pictures in mind, one of which was this particular determinate [the specific situation to which someone proposes to apply the statute]?" * * *

J. Hurst, Dealing With Statutes 34–35 (1982) (*quoting* Radin, *Statutory Interpretation,* 43 Harv.L.Rev. 863, 870 (1930)).

In this case we are presented with evidence that Congress *did* in fact focus precisely on this

specific situation. Congress had in mind the distinction between two "ends"—encouraging *versus* mandating family participation—as well as the distinction between two "means"— grantees communicating with teenagers *versus* communicating with parents. Congressional intent can rarely be made more clear or more specific than in this case.

**37.** *See* brief for appellants at 10.

**38.** The other two "changes" included in the amendment are the elimination of certain grants for reproductive and population research and the addition of a requirement that the Secretary conduct a study of the states' willingness and ability to administer the family planning program in the future. *See* H.R.Conf. Rep. No. 208, 97th Cong., 1st Sess. 799 (1981).

**39.** Although a change in statutory language may presumptively indicate a change of legislative intent, if the legislative history does not support such an interpretation this rule of construction is overcome. *See McElroy v. United States,* 455 U.S. 642, 650–651 n. 14, 102 S.Ct. 1332, 1337–1338 n. 14, 71 L.Ed.2d 522 (1982).

which the various committee report references to this policy track, almost verbatim, the language of the 1981 Conference Committee report.

In 1975, for example, the Senate report accompanying the Title X reauthorization bill stated:

> [T]he Committee believes that *unmarried teenagers,* where feasible, should be *encouraged* to involve their family [*sic*] in their decision about use of contraceptives.

S.Rep. No. 29, 94th Cong., 1st Sess. 55 (1975) (emphasis added). The Senate report accompanying that chamber's version of the 1978 Title X reauthorization bill also emphasized the encouragement of family involvement:

> This policy * * * has been stressed in prior committee reports and is a *reassertion of existing Federal policy.* It is not intended to restrict or discourage the provision of voluntary family planning services to those adolescents who want them, but only to try to enhance communication within the family unit.

S.Rep. No. 822, 95th Cong., 2d Sess. 40 (1978) (emphasis added). Finally, the House report accompanying its version of the bill subsequently enacted as the 1981 amendment noted "*past* Committee concern that in the process of contraceptive counseling, *unmarried teenagers, where feasible,* should be *encouraged* to involve their families in their decision about use of contraceptives." H.R.Rep. No. 158, 97th Cong., 1st Sess. 82 (1981) (emphasis added; footnote omitted).

In light of this consistent legislative history, we believe that the reasonable and correct interpretation of the 1981 amendment is that offered by appellees: the added statutory language merely served to emphasize existing congressional policy and thus provides no basis for the Secretary's radical departure in the means by which such family involvement is to be effectuated.[40]

### c. *Congressional policy of protecting confidentiality.*

Congress, however, has long recognized not only the importance of family involvement, but the crucial importance as well of preserving patient confidentiality in the Title X program. In 1972 the Secretary first promulgated a regulation to ensure doctor-patient confidentiality in Title X programs. These regulations remain in effect unchanged. *See* 42 C.F.R. § 59.11 (1982).[41] Congress was fully aware of this consistent administrative practice and in particular recognized the critical role played by the assurance of confidentiality in attracting adolescents to the clinics. For example, the Senate report accompanying the 1977 reauthorization of Title X expressly acknowledged that teenagers more readily seek family planning services at Title X facilities precisely because of the policy of patient confidentiality:

> [T]he Committee believes HEW must not overlook the preference of many individuals, particularly the teenage target group, for family planning clinics as the initial entry point to family planning informa-

**40.** *See* brief for NFPRHA at 43–44; brief for Planned Parenthood at 20. Indeed, this 1981 "codification" of existing congressional sentiment as to family participation can be closely analogized to the 1978 "codification" of the goal of serving the contraception needs of the adolescent population. Certainly the Title X clinics had always done so, but including adolescents expressly in the statute signified the extent of Congress' concern. *See* pp. 651–652 *supra.*

**41.** Still in effect pending this appeal, the regulation provides:

> All information as to personal facts and circumstances obtained by the project staff

about individuals receiving services must be held confidential and must not be disclosed without the individual's consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality. Otherwise, information may be disclosed only in summary, statistical, or other form which does not identify particular individuals.

42 C.F.R. § 59.11 (1982). Since the regulations also provide that Title X services be made available "without regard to * * * age, sex, * * or marital status." *see* 42 C.F.R. § 59.5(a)(4) (1982), this policy of confidentiality has always extended to adolescents.

tion and services. This preference is due partially to the greater degree of *teenage confidence in the confidentiality which can be assured by a family planning clinic* and in the proficiency of the family planning services provided in a clinic specializing in those and related services.[42]

Thus Congress made clear that confidentiality was essential to attract adolescents to the Title X clinics; without such assurances, one of the *primary purposes of* Title X—to make family planning services readily available to teenagers—would be severely undermined.

Particularly noteworthy in the legislative history is the 1978 defeat in the House of Representatives of an amendment to Title X offered by Representative Harold L. Volkmer. The proposal would have expressly required Title X grantees to notify parents prior to prescribing contraceptives, thereby abandoning the policy of preserving teenagers' confidences.[43] In the debate on the Volkmer amendment, several congressmen expressed their belief that parental notification would sacrifice the policy of providing confidential services, deter teenagers from coming to Title X clinics,[44] and so result in an increased number of teenage pregnancies. The Acting Secretary of HEW at that time echoed these concerns: "[E]nactment of * * * [the Volkmer

amendment] would undermine the national effort to alleviate the growing problem of teenage pregnancy in this country * * *."[45]

It is beyond dispute that courts must be cautious in attributing great significance to legislative intent as expressed by legislative inaction.[46] Nevertheless, we find that Congress' obvious awareness of the administrative practice as to confidentiality as well as its failure to change this practice when presented with the opportunity provide sufficient support for the conclusion that Congress—at least prior to 1981—had embraced the policy of maintaining teenage confidentiality in the Title X program.[47]

As for the 1981 amendment, we see no evidence whatever that Congress intended to change its longstanding belief that confidentiality was a crucial factor in attracting teenagers to Title X clinics and thereby in stemming the epidemic increase in teenage pregnancies. In fact, we firmly believe that the express language of the statute, requiring Title X grantees to encourage family participation "to the extent practical," refers to just such realistic concerns about deterring teenagers from seeking contraception if their confidences are not respected. Were the Secretary's regulations permitted to stand, the goal of family involvement would undermine both Congress' specific policy of confidentiality[48]

---

**42.** S.Rep. No. 102, 95th Cong., 1st Sess. 26 (1977) (emphasis added). *See also* H.R.Rep. No. 1191, 95th Cong., 2d Sess. 31 (1978); S.Rep. No. 822, 95th Cong., 2d Sess. 27–31 (1978).

**43.** The Volkmer amendment would have required Title X recipients to notify the parents of any teenager under 16 before prescribing or dispensing any prescription for birth control purposes. *See* 124 Cong.Rec. 37044 (1978) (statement of Rep. Volkmer).

Although this proposal required *prior* notification and was restricted to the under-16 age group, both this amendment and the regulation at issue here mandated parental notification and family involvement.

**44.** *See, e.g.,* 124 Cong.Rec. 37044 (1978) (remarks of Rep. Rogers); *id.* at 37047 (remarks of Rep. Preyer).

**45.** Letter from Acting Secretary of HEW Hale Champion to Representative Paul S. Rogers

(Sept. 25, 1978), *quoted in* brief for NFPRHA at 17–18.

**46.** *See, e.g., Aaron v. SEC,* 446 U.S. 680, 694 n. 11, 100 S.Ct. 1945, 1954 n. 11, 64 L.Ed.2d 611 (1980); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381–382 n. 11, 89 S.Ct. 1794, 1801–1802 n. 11, 23 L.Ed.2d 371 (1969). *See generally* 3 J. CHOPER, Y. KAMISAR & L. TRIBE, THE SUPREME COURT: TRENDS AND DEVELOPMENTS 181–190 (1982).

**47.** *See, e.g., Bob Jones University v. United States,* —— U.S. ——, ——, 103 S.Ct. 2017, 2034–2035, 76 L.Ed.2d 157 (1983); *Haig v. Agee,* 453 U.S. 280, 300–301, 101 S.Ct. 2766, 2778–2779, 69 L.Ed.2d 640 (1981).

**48.** Appellants contend that a parental notification rule would not violate the policy of providing services to adolescents on a confidential basis since the adolescent can avoid this result simply by not obtaining contraceptives. *See* reply brief for appellants at 11–12. This argu-

and its overriding concern about the escalating teenage pregnancy rate. In the absence of a clearly expressed intent to the contrary, we will not construe the 1981 amendment in a manner which would undermine Congress' broad purposes for enacting Title X in the first place.[49]

## C. *Title XX*

Appellants seek support for their strained interpretation of the 1981 amendment to Title X in yet another, separate statute. Title XX of the Act, 42 U.S.C. § 300z *et seq.* (Supp. V 1981), was enacted as part of the same legislative package as the Title X amendment. It established a new grant program for demonstration projects to provide services and research related to adolescent sexuality and pregnancy. Title XX expressly requires family involvement by mandating parental notification and consent, 42 U.S.C. § 300z–5(a)(22)(A)(i),[50] as well as by determining eligibility for the program on the basis of family income, *id.* § 300z–3(c). Indeed, Congress' intent in Title XX is to make family involvement the centerpiece of this program designed explic-

itly to discourage adolescent sexual relations. *See id.* § 300z(a)(9).[51]

Appellants contend that Congress' philosophical intent in Title XX can and should be used to inform any interpretation of Title X. More specifically, Title XX's explicit requirement of parental notification "demonstrated that [Congress] believed parental notification to be important policy in and of itself." *See* brief for appellants at 22. On this view, if Congress approved of parental notification in one context, it should be presumed to intend its use in a related context as well.

This argument totally ignores the very different nature of the two programs. Title X is the largest of the Federal Government's family planning programs, designed to serve the family planning needs of all persons in need of such services. Title XX, by contrast, is a limited and experimental program; it provides for "demonstration projects" with a special emphasis on serving the needs of already pregnant adolescents and the *prevention* of adolescent sexual relations, *see* 42 U.S.C. § 300z–1(a)(7) & (8). While some traditional family planning

ment is specious. Parental notification necessarily disrupts the confidential doctor-patient relationship. That a teenage girl may be forewarned of this policy and so choose not to seek services does not alter the fact that Title X clinics are required to breach any confidences that are made.

We note that appellants' reliance on language cropped out of this court's opinion in *Planned Parenthood Ass'n of Utah v. Schweiker; supra* note 34, 700 F.2d at 722 n. 28, is misplaced. That language is *obiter dicta* in that case and irrelevant to this one.

**49.** *See, e.g., FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968); *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 689 (D.C.Cir.1973) ("In determining legislative intent, our duty is to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain language of the statute.").

**50.** In fact, enactment of Title XX's parental notification and consent requirements provides additional support for our conclusion that Title

X's "encouragement" language does not reasonably encompass a parental notification regulation. Title XX repealed Title VI of the Health Services and Centers Amendments of 1978. Title VI contained language encouraging family involvement that was virtually identical to the sentence added by the 1981 amendment to Title X. In its report accompanying Title XX the Senate committee stressed that the addition of Title XX's *express* language mandating parental notification and consent was essential since Title VI's requirement that grantee's " 'encourage' their adolescent clients to discuss with their parents the use of birth control * * * does not require parental notification and consent." S.Rep. No. 161, 97th Cong., 1st Sess. 4 (1981).

**51.** For example, Congress expressly found that:

since the family is the basic social unit in which the values and attitudes of adolescents concerning sexuality and pregnancy are formed, programs designed to deal with issues of sexuality and pregnancy will be successful to the extent that such programs encourage and sustain the role of the family in dealing with adolescent sexual activity and adolescent pregnancy[.]

42 U.S.C. § 300z(a)(10)(A).

services may be provided under limited circumstances, *see id.* § 300z–3(b)(1), the primary thrust of Title XX clearly lies elsewhere.

The distinct differences in the scope and purposes of the two programs necessarily dictate different approaches to striking an appropriate balance between the need for confidentiality and the goal of parental involvement. The Senate report accompanying Title XX clearly delineated these differences and their consequences:

> It must be stressed, however, that this [Title XX] program is to be a demonstration project in which the Federal Government attempts to promote family-centered approaches to serious social problems. Unlike contraceptive services or venereal disease treatments, adolescent pregnancy cannot be an indefinitely confidential affair. Furthermore, it should be noted that this [Title XX] program is a Federal demonstration project and not a far-ranging Government entitlement program. These requirements [*e.g.,* parental notification and consent] are an attempt to determine the effect that such parental involvement requirements might have on a small scale.[52]

As an experimental demonstration project, then, Title XX provides a useful, but limited, context in which Congress may experiment and then evaluate the impact on teenagers of mandating family notification and involvement without irrevocably undermining its large-scale family planning program. Congress has, in fact, since indicated its intent to "monitor the progress of the projects involved very carefully" and to hold hearings to assess "the implementation and impact of the parental involvement requirement under this experimental program." [53]

It would therefore be both illogical and contrary to legislative intent to follow appellants' suggestion and "import" the strong family involvement component of Title XX into Title X.[54] In point of fact, one senator feared just such an inappropriate amalgamation of the two programs. To clarify the limited nature of Title XX's requirements, Senator Mark Hatfield, chairman of the Appropriations Committee, raised the issue during the debate over HHS's appropriations for 1982:

> Mr. President, while we are in Labor-HHS matters, may I ask the Senator from New Mexico, the chairman of the Labor, Health and Human Services and Education Subcommittee, about language in the committee report concerning adolescent family life program? There has been some concern expressed that the report language could somehow be interpreted to apply the "parental consent and notification" provisions of the adloescent [*sic*] family life program to other programs under the jurisdiction of the Department of Health and Human Services. Can the Senator tell me whether the language does apply to Health and Human Services programs other than adolescent family life?

Whereupon Senator Schmitt, chairman of the Subcommittee on Labor, Health and Human Services, and Education, responded, "It does not." *See* 128 Cong.Rec. S10067 (daily ed. Aug. 10, 1982).

Notwithstanding this insurmountable evidence that Title XX's parental notification requirements were not intended to apply to Title X, appellants argue that the Secretary was properly guided by the philosophy of Title XX. They point to a review provision of Title XX as strong evidence of Congress' intent to apply the family-centered philosophy of Title XX outside the narrow confines of its specified programs. Section 300z–6(a)(3) calls on the Secretary to:

---

**52.** S.Rep. No. 161, 97th Cong., 1st Sess. 15 (1981).

**53.** S.Rep. No. 516, 97th Cong., 2d Sess. 130 (1982) (report of the Senate Appropriations Committee authorizing funds for Title XX).

**54.** Our reluctance to interpret Title X in light of the policies underlying Title XX is buttressed by the general rule that "we cannot properly construe even related pieces of legislation without due regard to the purposes they respectively serve." *United Shoe Workers of America v. Bedell,* 506 F.2d 174, 188 (D.C.Cir.1974).

review all programs administered by the Department of Health and Human Services which provide prevention services or care services to determine if the policies of such programs are consistent with the policies of this subchapter * * *."

42 U.S.C. § 300z–6(a)(3). This language, however, merely calls for review of existing federal family programs to *identify* any inconsistencies in policy. It does not authorize the Secretary, on her own, to *remedy* any such inconsistencies by regulation. In fact, the Senate report accompanying Title XX makes clear the limits of the Secretary's authority to act:

*Remedial legislation or regulations* to alter any Federal programs that the Secretary may identify as duplicative or inconsistent with the new Federal policy contained in this legislation should be formulated as quickly as possible.

S.Rep. No. 161, 97th Cong., 1st Sess. 16 (1981) (emphasis added). The use of the words "remedial legislation" clearly concedes that the Secretary may not be able to alter by regulation alone every program deemed "inconsistent" with Title XX. Given Congress' express intent to limit Title XX's parental notification and consent requirements to the confines of that experimental program, the Secretary has no authority deriving from this provision in Title XX to graft comparable parental notification requirements onto the structure of the completely separate Title X program.[55]

D. *State Notification and Consent Requirement*

Having determined that the new regulations' parental notification requirement is inconsistent with Congress' intent in Title X and finds no support in Title XX, we need not tarry long in disposing of appellants' arguments as to the other two requirements.

The Secretary's requirement that Title X grantees comply with prevailing state law as to parental notification or consent constitutes an invalid delegation of authority to the states. As the District Court found:

Although Congress is free to permit the states to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states. Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs. * * * [56]

In the absence of Congress' express authorization to HHS to in turn empower the states to set eligibility criteria, the Secretary has no power to do so. Therefore, in enacting such a regulation in this case the Secretary has exceeded the limits of Congress' delegated authority. *See Chrysler Corp. v. Brown, supra,* 441 U.S. at 308, 99 S.Ct. at 1720.

Furthermore, even if Congress had authorized the Secretary to delegate to the states the power to set eligibility standards, the state laws would still have to conform with the existing requirements of Title X and its regulations. It is elementary that under the Supremacy Clause of the Constitution states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing

---

55. Appellants also seek support for their argument from this court's recent decision in *Planned Parenthood Ass'n of Utah v. Schweiker, supra* note 34. They read the case as standing for the proposition that congressional intent as expressed in Title XX was to be utilized in interpreting Title X. *See* 700 F.2d at 724–725. This interpretation misreads our decision. The court held that Title XX's directive to the Secretary to give priority to coordinated grant applications, *see* 42 U.S.C. § 300z–6(a)(4), could be extended to allow for coordination of projects within Title X's purview. However, the court permitted this consolidation of grants in Title X because it "found nothing in the language of Title X that declares considered consolidation of a grant in a state agency inappropriate." *Id.* at 725. In the instant case, of course, Title X is *not* similarly silent on the issue of parental notification. Moreover, the decision in *Planned Parenthood Ass'n of Utah* was strictly limited to consideration of the mechanics of grant administration. Its reasoning should not be extended to apply to the more substantive provisions of the two programs.

56. *Planned Parenthood, supra* note 19, 559 F.Supp. at 669.

federal statutory or regulatory scheme. *See Jones v. T.H.,* 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976), *aff'g mem. only on statutory grounds sub nom. T———— H———— v. Jones,* 425 F.Supp. 873 (D.Utah 1975). *See also Lascaris v. Shirley,* 420 U.S. 730, 95 S.Ct. 1190, 43 L.Ed.2d 583 (1975); *Carleson v. Remillard,* 406 U.S. 598, 600–601, 92 S.Ct. 1932, 1934, 32 L.Ed.2d 352 (1972); *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

The only court to consider this issue in the context of Title X squarely concluded that West Virginia's attempt to require parental consent as a condition to the provision of family planning services constituted the imposition of an additional eligibility requirement that clearly thwarted the goals of Title X. *See Doe v. Pickett,* 480 F.Supp. 1218, 1220–1221 (D.W.Va.1979). Since we have concluded that, even after the 1981 amendment, the continuing policies of Title X prohibit the Secretary from requiring parental notification, the states would likewise be precluded from imposing similar conditions.[57]

### E. *Financial Eligibility Requirement*

The elimination of the current regulation as to teenagers' financial eligibility is clearly entailed by the Secretary's imposition of the parental notification requirement. The new regulation deletes the following: "[U]nemancipated minors who wish to receive services on a confidential basis must be considered on the basis of their own resources."[58] If the confidentiality of adolescents is no longer to be respected, then the above requirement is logically unnecessary.[59]

■ However, since the parental notification requirement is invalid, then so too is this change in determining financial eligibility. We thus agree with the reasoning of the District Court: the regulation requiring that an adolescent's eligibility for services be based on her parents', rather than her own, income is invalid "because it has the same effect as the parental notification requirement." *Planned Parenthood, supra,* 559 F.Supp. at 669. Clearly, if a minor must obtain financial information from her parents to determine her own eligibility for family planning services, the regulation denies her the requisite confidentiality and operates as a *de facto* parental notification requirement. Indeed, if the parents do not meet the eligibility standards and the minor has no funds of her own, the regulation may operate as a *de facto* parental *consent* rule; by withholding funds, the parents can prevent the teenager from receiving any contraceptive services at Title X clinics. Either way, the regulation operates as a deterrent to teenage access to contraceptive services, thereby undermining Title X's goal of reducing the teenage pregnancy rate.

Moreover, the regulation also conflicts with Title X's specific admonition that the Secretary define "low-income" families in such a way as to insure that "economic

---

**57.** Appellants argue that the regulation merely clarifies the fact that state law has not been "preempted" by federal law. *See* brief for appellants at 30–32. This argument is misplaced. This case presents no direct conflict between two bodies of law, one state and one federal. We have only a *voluntary* federal funding program with specific eligibility requirements. The law on this issue is clear: even if Congress permits the states to impose additional rules as to eligibility for federal funding, those rules must be consistent with the federal standards or else be held invalid under the Supremacy Clause. *See Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971).

**58.** Pursuant to this rule, the current practice appears to be that Title X grantees make their

financial determinations on the basis of whatever information is provided by the client—whether that client is an adult or a minor. *See* letter from Nancy L. Buc, Counsel for Planned Parenthood Plaintiffs, to George A. Fisher, Clerk of this court, dated May 18, 1983; letter from John W. Nields, Jr., Attorney for National Family Planning and Reproductive Health Association, Inc., *et al.,* to George A. Fisher, Clerk of this court, dated May 18, 1983 (letters submitted after oral argument in this case at our request).

**59.** Appellants concede that: "The sentence in question is fundamentally contrary to the new regulation requiring parental notification." Brief for appellants at 33.

status shall not be a deterrent to participation in the programs assisted under [Title X]." 42 U.S.C. § 300a–4(c). Reflecting its general concern about the problems of adolescent pregnancy, Congress clearly intended to include *all* adolescents—not just those from low-income families—among the groups benefited by Title X. *See, e.g.,* H.R. Rep. No. 158, 97th Cong., 2d Sess. 79 (1981); H.R.Rep. No. 1191, 95th Cong., 2d Sess. 30 (1978). In short, the new financial eligibility requirement conflicts with the basic purpose and express provisions of Title X, finds no basis elsewhere in the Act, and is therefore invalid.[60]

## IV. Conclusion

This court is, of course, fully aware that these Title X regulations are at the center of a great whirlwind of public controversy. No doubt the moral and political wisdom of the Secretary's actions will remain in dispute for some time to come. The legality of those actions, however, should not. Our review of Title X and its legislative history leads to the inescapable conclusion that the Secretary exceeded the bounds of statutory authority by promulgating regulations that contravene congressional intent.

We hold that the challenged regulations are unlawful. The judgment of the District Court enjoining enforcement of the regulations is therefore

*Affirmed.**

60. Appellants argue that by requiring consideration of a teenager's financial eligibility on the basis of her family's income, the new regulation quite properly gives priority to the contraceptive needs of the truly indigent population. While this may well be a reasonable policy choice given the limits of federal funding, it is a choice that Congress, and not the Secretary, must make. Thus far Congress has clearly intended that *all* teenagers have access to Title X services. *See* 42 U.S.C. § 300(a); pp. 651–652 *supra.*

* Judge Bork, in his partial dissent, suggests that "the Secretary might well be able to issue all three of the challenged regulations under legal power different from the one initially claimed," and that "the proper disposition of this case is to direct that the regulations be remanded to

BORK, *Circuit Judge, concurring in part and dissenting in part:*

I dissent from the majority's disposition of the case although I agree with much of the majority's opinion. It is one thing to conclude that the 1981 amendment to Title X does not give authority for the promulgation of the rules challenged here. I agree that the amendment does not. It is quite another matter to decide, as the majority does, that the 1981 amendment affirmatively forbids the promulgation of these rules. That has not been persuasively shown. It is especially important that this distinction be borne in mind because we are dealing in a vexed and hotly controverted area of morality and prudence. The choices required are to be made by Congress or, under a delegated power, by the Secretary of the Department of Health and Human Services. So far as I can tell from the arguments deployed by the Secretary and from the evidence cited by the majority, Congress has not made those choices. Neither has the Secretary, since she believes she is implementing decisions made by Congress. We should not, by a legal analysis that overlooks an important differentiation between two types of congressional intent, effectively make moral and prudential decisions that are properly left to those who are politically responsible. For that reason, rather than affirm the judgment of the district court, I would direct the district court to remand the challenged regulations to the Secretary for reconsideration.

HHS for reconsideration." Dissent at 668. In this case this court is reviewing the judgment of the District Court enjoining enforcement of these regulations. Judge Bork has conceded that "[t]he evidence cited by the majority amply demonstrates the error in HHS's position" and "therefore, that the regulations cannot stand as promulgated." Dissent at 667. Thus under the circumstances the District Court properly enjoined enforcement of the invalid regulations, and the proper disposition on appeal is affirmance of the District Court. The Secretary is of course free to issue new and different regulations, but any future rulemaking in this area must comport with the clear congressional intent expressed in Title X and its legislative history, as outlined in this court's opinion.

Under *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we must judge the validity of an administrative regulation solely on "the grounds upon which the [agency] itself based its action." *Id.* at 88, 63 S.Ct. at 459. In particular, an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it "was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable." *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 96, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1953). If a regulation is based on an incorrect view of applicable law, the regulation cannot stand as promulgated, unless the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Massachusetts Trustees v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964).

HHS based its decision to promulgate the regulations challenged in this case on the 1981 amendment to Title X. In the preamble to the regulations HHS stated generally: "The rules implement a 1981 amendment to Title X which requires projects supported by Title X to encourage, to the extent practical, family participation in the provision of project services." 48 Fed.Reg. 3600 (1983); Addendum to Brief for the Appellants at 14a [hereinafter "Addendum at (   )"]. *Accord id.* at 3601; Addendum at 15a ("The rules below implement this statutory requirement."). Most important, with respect to the notification rules in particular, HHS stated that it was specifically relying on the 1981 amendment for authorization as an alternative to relying on any statutory authority it may have had prior to 1981:

> It is on the basis of this amendment that the notification provisions of the regulation have been proposed and it is in the light of this amendment and its legislative history that one must judge the propriety of the notification provisions, not the legislative history surrounding defeated legislative proposals or interpreta-

tions of the statute prior to the 1981 amendment.

*Id.* at 3602; Addendum at 16a. Thus, HHS substantially relied for its decision to adopt the notification provision on the legal position that the 1981 amendment was intended to give HHS the authority to adopt such a provision. *See also* Brief for the Appellants at 18–19.

The situation is different with respect to the rule requiring compliance with state parental consent and notification laws and with respect to the change in prior regulations defining "low-income family." HHS did not state in the preamble to its regulations that these two provisions were specifically authorized by the 1981 amendment. As the HHS brief in this case makes clear, however, these two provisions were adopted in significant part because of HHS's adoption of the notification provision and its understanding of the meaning of Congress's 1981 enactments. *See* Brief for the Appellants at 30 (rule on compliance with state law "merely clarifies that state law has not been preempted by federal law"); *id.* at 32 n. 10 ("Since Congress has expressly approved Title XX's requirement for parental permission and notification, it is no longer possible to view similar state provisions as contrary to federal policy. The two district court cases cited by the district court to show that state notification and consent rules are contrary to the intent of Title X were decided before Congress enacted the 1981 Amendment or Title XX.") (citation omitted); *id.* at 33–34 ("One reason for this change [in the low-income family regulations] is obvious. The sentence in question [, removed by the challenged provision,] is fundamentally contrary to the new regulation requiring parental notification. While project directors retain great discretion under the regulations to determine those who 'for good reasons' may be unable to pay for services, they may not continue to base this discretion solely on an adolescent's desire to receive services without parental notification.") (citation omitted).

Whatever legal errors HHS made in promulgating the notification provision thus infected its promulgation and apparent interpretation of the other two provisions under challenge, and "there is a significant chance that but for the error[s] the agency might have reached a different result" on all three provisions of the challenged regulations. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 211 (footnote omitted). If HHS made legal errors that require invalidation of the notification rule, those errors require invalidation of all three parts of the challenged regulations.

I agree with the majority opinion to the extent it holds that HHS is wrong in the view that the 1981 amendment gave the Secretary the authority to promulgate the parental notification rule. The evidence cited by the majority amply demonstrates the error in HHS's position. I agree, therefore, that the regulations cannot stand as promulgated.

I depart from the majority because I think that nothing further should be decided in this case. Under *Chenery* and its progeny, a rule that cannot stand as promulgated should be remanded to the administrative agency for reconsideration if it is arguable that the agency could correct its initial errors and lawfully reissue the rule. The regulations at issue here fall into that category and therefore should be remanded to HHS for reconsideration.

Since HHS is ordinarily owed some deference in the interpretation of a statute like Title X, *see, e.g., Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 166–70 (D.C.Cir. 1982), HHS should be given an opportunity to say in the first instance not only whether it wants to readopt the regulations but also whether it can do so under some statutory authority other than the 1981 amendment alone. That HHS has other statutory au-

thority to issue these rules is, at the very least, arguable.

As the majority opinion recognizes, "the rulemaking authority that Congress has delegated to the Secretary is broad indeed." Maj. op. at 655. Title X says: "Grants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." 42 U.S.C. § 300a–4(a) (1976). The Secretary thus has a rulemaking power that would authorize the notification regulation challenged here unless Congress has deprived the Secretary of that particular authority. Certainly Congress has not done so by any statutory language, and a careful reading of the majority opinion shows that only a few snippets of the legislative history it cites can offer any support at all for an inference of congressional restriction of otherwise broad agency authority. "Congress must abide by its delegation of authority until that delegation is legislatively altered or revoked." *INS v. Chadha,* —— U.S. ——, ——, 103 S.Ct. 2764, 2786, 77 L.Ed.2d 317 (1983) (footnote omitted). It is, as I have said, at the very least arguable that Congress has not done so with respect to the parental notification rule here.

In truth, there is very little evidence to show that Congress has prohibited the Secretary from adopting a rule requiring parental notification. It would be no small matter to decide, as proponents of the rule would put it, that the federal government will assist teenagers in conducting active sexual lives but that their parents may not be told. As the rulemaking proceeding at issue in this case makes clear, a decision that parents must be told—as opponents of the challenged rule put it, thereby risking more teenage pregnancies—would also be highly controversial. Either way, the political consequences for some legislators might be serious. Legislators are made politically responsible, however, precisely so that they will take such consequences into account. If Congress wants the result the majority gratuitously attributes to it, it must say so. I might yet be convinced that it has, but the

evidence put forth in this case suggests that it has not.

If a case might be made that the Secretary has the authority to promulgate the parental notification rule, an even stronger case might be made that the Secretary has the authority to issue the other two provisions challenged in this lawsuit. A valid parental notification rule, of course, would remove the fundamental objection to the state-law and low-income-family rules relied on by the appellees and the majority here. In addition, however, these latter two rules might also find a basis substantially independent of any federal parental notification rule.

The change in the low-income-family regulations might well be a rational implementation of the Title X policy, embodied in 42 U.S.C. § 300a–4(c) (1976), of giving priority to "persons from low-income families," a policy that the majority opinion inexplicably suggests is of the Secretary's, not Congress's, creation. *See* maj. op. at 665 n. 60. That policy might rationally be thought to qualify—it does not contradict—Title X's general purpose of "assist[ing] in making comprehensive voluntary family planning services readily available to all persons desiring such services." 42 U.S.C. § 300 note (1976). It should be noted that, contrary to the majority's suggestion, maj. op. at 651–652, 665 n. 60, it is not Title X's general purpose to provide family planning services entirely through Title X clinics to all who seek them. The sweep of the majority's suggestion is hardly required by the statutory language just quoted and is inconsistent with the prominence in the congressional declaration of purposes of the goal of aiding private family planning programs. *See* 42 U.S.C. § 300 note (1976). Congress's object was merely to help ensure that, in one way or another, all persons who wanted family planning services could get them.

Similarly, a rule requiring Title X grantees to comply with state parental consent and notification laws might be valid even if a federal parental notification rule were not. That is so because Congress might forbid HHS from requiring parental

notification yet, in recognition of states' traditional role in this area, defer to states that have such a requirement. Contrary to the majority's statement, maj. op. at 664 n. 57, the validity of a rule requiring grantees to obey state laws presents a preemption problem of "direct conflict between two bodies of law," *id.* The rule's validity turns on whether Congress intended to give grantees a federal-law defense to a charge of violating state law. Support for such a rule might be found in the "presumption against congressional intent to encourage violation of declared public policy [in a state law]." *Tank Truck Rentals, Inc. v. Commissioner,* 356 U.S. 30, 35, 78 S.Ct. 507, 510, 2 L.Ed.2d 562 (1958), *quoted in Bob Jones University v. United States,* —— U.S. ——, —— n. 17, 103 S.Ct. 2017, 2028 n. 17, 76 L.Ed.2d 157 (1983). Support might also derive from the especially high standard that must be met when inferring preemption of state laws in areas such as family relations and medical ethics that are traditionally the exclusive or nearly exclusive province of state law. *See, e.g., Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1 (1979) (family relations). Where such policies are at stake, it is particularly important that we make sure Congress intended to oust state laws. One function of the rules about preemption is to ensure that critical decisions are consciously made.

In sum, the Secretary might well be able to issue all three of the challenged regulations under legal power different from the one initially claimed. Whether regulations so promulgated would be valid need not and should not be decided until HHS decides to adopt them and articulates a rationale for doing so. Because the validity of reissued regulations is at least arguable, however, the proper disposition of this case is to direct that the regulations be remanded to HHS for reconsideration. The majority goes farther and holds that the challenged regulations are inconsistent with a congressional command. I dissent from that holding.